Marcia FREEMAN, Plaintiff-Appellant,

v.

Arthur J. DECIO, V. Dale Swikert, Samuel P. Mandell, Ira J. Kaufman, and Skyline Corporation, Defendants-Appellees.

No. 78–1142.

United States Court of Appeals, Seventh Circuit.

Argued May 22, 1978.

Decided Sept. 20, 1978.

Rehearing and Rehearing En Banc Denied Nov. 2, 1978.

David W. Cohen, New York City, for plaintiff-appellant.

Michael H. Rauch, New York City, for defendants-appellees.

Before PELL and WOOD, Circuit Judges, and HARPER, Senior District Judge.*

HARLINGTON WOOD, JR., Circuit Judge.

The principal question presented by this case is whether under Indiana law the

---

* The Honorable Roy W. Harper, Senior United States District Judge for the Eastern and West- ern Districts of Missouri, is sitting by designation.

plaintiff may sustain a derivative action against certain officers and directors of the Skyline Corporation for allegedly trading in the stock of the corporation on the basis of material inside information. The district court granted summary judgment for the defendants on the ground that in light of the defendants' affidavits and documentary evidence, the plaintiff had failed to create a genuine dispute as to whether the defendants' sales of stock were based on material inside information. Alternatively, the court held that the plaintiff had failed to state a cause of action in that Indiana law has never recognized a right in a corporation to recover profits from insider trading and is not likely to follow the lead of the New York Court of Appeals in *Diamond v. Oreamuno,* 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969), in creating such a cause of action. We affirm. The second issue presented here is whether an insider "purchased" restricted stock within the meaning of Section 16(b) of the Securities Exchange Act of 1934 at the time that he made the commitment to acquire the stock and paid for it or at the time that the restrictions lapsed. We agree with the district court's conclusion that the former date was the one to consider.

Plaintiff-appellant Marcia Freeman is a stockholder of the Skyline Corporation, a major producer of mobile homes and recreational vehicles. Skyline is a publicly owned corporation whose stock is traded on the New York Stock Exchange (NYSE). Defendant Arthur J. Decio is the largest shareholder of Skyline, the chairman of its board of directors, and until September 25, 1972, was also the president of the company. Defendant Dale Swikert is a director of Skyline and prior to assuming the presidency from Decio in 1972 was Skyline's executive vice president and chief operating officer. Defendants Samuel P. Mandell and Ira J. Kaufman are outside directors of Skyline.

Throughout the 1960's and into 1972 Skyline experienced continual growth in sales and earnings. At the end of fiscal 1971 the company was able to report to its shareholders that over the previous five years sales had increased at a 40% average compound rate and that net income had grown at a 64% rate. This enormous success was reflected in increases in the price of Skyline stock. By April of 1972 Skyline common had reached a high of $72.00 per share, representing a price/earnings ratio of greater than 50 times earnings. Then, on December 22, 1972, Skyline reported that earnings for the quarter ending November 30, 1972, declined from $4,569,007 to $3,713,-545 compared to the comparable period of the preceding year, rather than increasing substantially as they had done in the past. The NYSE immediately suspended trading in the stock. Trading was resumed on December 26 at $34.00 per share, down $13.50 from the preannouncement price. This represented a drop in value of almost 30%.

Plaintiff alleges that the defendants sold Skyline stock on the basis of material inside information during two distinct periods. Firstly, it is alleged that the financial results reported by Skyline for the quarters ending May 31 and August 31, 1972, significantly understated material costs and overstated earnings. It is further alleged that Decio, Kaufman and Mandell made various sales of Skyline stock totalling nearly $10 million during the quarters in question, knowing that earnings were overstated. Secondly, plaintiff asserts that during the quarter ending November 30 and up to December 22, 1972, Decio and Mandell made gifts and sales of Skyline stock totalling nearly $4 million while knowing that reported earnings for the November 30 quarter would decline. The complaint also alleged that certain of Mandell's and Kaufman's transactions in Skyline stock violated Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b).[1]

1. The second amended complaint also contained allegations of violations of Sections 17(a) and 22(a) of the Securities Act of 1933, 15 U.S.C. §§ 77q(a) and 77v(a), and Sections 10(b)

After three years of extensive discovery both sides moved for summary judgment. The district court granted the defendants' Fed.R.Civ.P. 56 motions on the insider trading counts on the ground that Indiana law does not provide for a derivative cause of action on behalf of a corporation to recover profits from insider trading. Alternatively, the court found that, in view of the defendants' affidavits and depositions, the plaintiff had not succeeded in creating a genuine dispute as to whether the defendants' stock sales were made on the basis of material inside information.

Plaintiff's amended complaint also accused Mandell and Swikert of violating Section 16(b) of the 1934 Act by making both purchases and sales of Skyline stock within a six-month period. In Swikert's case the shares allegedly purchased consisted of restricted stock acquired under Skyline's Management Incentive Plan. On summary judgment, the district court rejected plaintiff's arguments that these shares were "purchased" by Swikert within the meaning of Section 16(b) at the time the restrictions lapsed, in favor of the view that they were purchased at the time that Swikert committed himself to acquire them and made payment for them. The 16(b) claim against Swikert was accordingly dismissed since the earlier date was more than six months before any of Swikert's sales. The 16(b) claim against Mandell was not ruled on by the district court in the judgment that has been appealed to this court, so we need not consider the issues there presented.[2]

The plaintiff now contends that the district court erred in granting the defendants' motions for summary judgment and in denying her own. We have jurisdiction of the appeal pursuant to 28 U.S.C. § 1291.

## I.

### Diamond v. Oreamuno and Indiana Law

Both parties agree that there is no Indiana precedent directly dealing with the question of whether a corporation may recover the profits of corporate officials who trade in the corporation's securities on the basis of inside information. However, the plaintiff suggests that were the question to be presented to the Indiana courts, they would adopt the holding of the New York Court of Appeals in *Diamond v. Oreamuno*, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969).[3] There, building on the Delaware case of *Brophy v. Cities Service Co.*, 31 Del.Ch. 241, 70 A.2d 5 (1949),[4] the court held that the officers and directors of a corporation breached their fiduciary duties owed to the corporation by trading in its stock on the basis of material non-public information acquired by virtue of their official positions and that they should account to the corporation for their profits from those transactions. Since *Diamond* was decided, few courts have had an opportunity to consider the problem there presented. In fact, only one case has been brought to our attention which raised the question of whether *Diamond* would be followed in another jurisdiction. In *Schein v. Chasen*, 478

and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78aa, as well as Rule 10b–5. No claim is being made on appeal that the complaint states a cause of action under any of these sections. *See Blue Chips Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

There were also allegations that Decio and Mandell were engaged in "plans of distribution" of their stock in violation of the federal securities laws and that they and the other defendants traded on the basis of their knowledge of these plans. This theory has also apparently been abandoned on appeal.

**2.** Both parties agree that the district court's opinion did not consider the merits of plaintiff's 16(b) claim against Mandell. However, plain-

tiff is concerned that the court's dismissal of the complaint was so broad as to include this claim. Although there is some ambiguity in the wording of the court's May 20, 1977 order, we construe that judgment as not disposing of Count III of the amended complaint containing the 16(b) claim against Mandell. We therefore lack jurisdiction over that claim.

**3.** *Diamond v. Oreamuno* has been noted at 83 Harv.L.Rev. 1421 (1970); 55 Va.L.Rev. 1520 (1969); 1970 Wis.L.Rev. 576. *See also* 9 Ga.L. Rev. 189 (1974).

**4.** *Brophy* has been noted at 63 Harv.L.Rev. 1446 (1950).

F.2d 817 (2d Cir. 1973),[5] *vacated and remanded sub nom., Lehman Bros. v. Schein,* 416 U.S. 386, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974), *on certification to the Fla.Sup.Ct.,* 313 So.2d 739 (Fla.1975), the Second Circuit, sitting in diversity, considered whether the Florida courts would permit a *Diamond*-type action to be brought on behalf of a corporation. The majority not only tacitly concluded that Florida would adopt *Diamond,* but that the *Diamond* cause of action should be extended so as to permit recovery of the profits of non-insiders who traded in the corporation's stock on the basis of inside information received as tips from insiders.[6] Judge Kaufman, dissenting, agreed with the policies underlying a *Diamond*-type cause of action, but disagreed with the extension of liability to outsiders. He also failed to understand why the panel was not willing to utilize Florida's certified question statute so as to bring the question of law before the Florida Supreme Court. Granting *certiorari,* the United States Supreme Court agreed with the dissent on this last point and on remand the case was certified to the Florida Supreme Court. That court not only stated that it would not "give the unprecedented expansive reading to *Diamond* sought by appellants" but that, furthermore, it did not "choose to adopt the innovative ruling of the New York Court of Appeals in *Diamond* [itself]."[7] 313 So.2d 739, 746 (Fla.1975). Thus, the question here is whether the Indiana courts are more likely to follow the New York Court of Appeals or to join the Florida Supreme Court in refusing to undertake such a change from existing law.[8]

It appears that from a policy point of view it is widely accepted that insider trading should be deterred because it is unfair to other investors who do not enjoy the benefits of access to inside information. The goal is not one of equality of possession of information—since some traders will always be better "informed" than others by dint of greater expenditures of time and resources, greater experience, or greater analytical abilities—but rather equality of access to information.[9] Thus, in *Cady, Roberts & Co.,* 40 S.E.C. 907, 912 (1961), the SEC gave the following explanation of its view of the obligation of corporate insiders to disclose material inside information when trading in the corporation's stock:[10]

> Analytically, the obligation rests on two principal elements: first, the existence of a relationship giving access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone, and second, the inherent unfairness involved where a party takes advantage of such information knowing it is unavailable to those with whom he is dealing.

5. The Second Circuit's decision in *Schein* has been noted in 74 Colum.L.Rev. 269 (1974); 42 Fordham L.Rev. 211 (1973); 87 Harv.L.Rev. 675 (1974); 1 J.Corp.L. 83 (1975); 45 U.Colo.L. Rev. 519 (1973).

6. The court would also have held liable the insiders and outsiders who acted as a conduit for the inside information to reach the trading outsiders, but who did not trade themselves.

7. Instead, the court stated that it would "adhere to previous precedent established by the courts in . . . [Florida] that actual damage to the corporation must be alleged in the complaint to substantiate a stockholders' derivative action."

8. Were it not for the fact that we agree with the district court's conclusion that there is no factual basis for the plaintiff's allegations that the defendants sold Skyline stock on the basis of inside information, we would seriously consider employment of the Indiana certified question statute. *See Lehman Bros. v. Schein,* 416 U.S. 386, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1976).

9. As was stated by Professor Hetherington, "[u]nder any 'game' theory of the market a player is likely to consider unfair any advantage gained by his competitors that he not only does not have, but that he *cannot obtain."* J. Hetherington, *Insider Trading and the Logic of the Law,* 1967 Wis.L.Rev. 720, 721 (1967).

10. A similar philosophy can be seen in the remarks of Representative Rayburn during the debate on the Securities Act of 1933:

> The purpose of this bill is to place the owners of securities on a parity, so far as is possible, with the management of the corporations, and to place the buyer on the same plane so far as available information is concerned, with the seller.

77 Cong.Rec. 2918 (1933), quoted in 5 Loss, Securities Regulation 2999 (1969).

Yet, a growing body of commentary suggests that pursuit of this goal of "market egalitarianism"[11] may be costly. In addition to the costs associated with enforcement of the laws prohibiting insider trading, there may be a loss in the efficiency of the securities markets in their capital allocation function.[12] The basic insight of economic analysis here is that securities prices act as signals helping to route capital to its most productive uses and that insider trading helps assure that those prices will reflect the best information available (i.e., inside information) as to where the best opportunities lie.[13] However, even when confronted with the possibility of a trade-off between fairness and economic efficiency, most authorities appear to find that the balance tips in favor of discouraging insider trading.[14]

Over 40 years ago Congress was stirred by examples of flagrant abuse of inside information unearthed during the hearings preceding the 1933 and 1934 Securities Acts to include in the latter a section aimed at insider trading.[15] Section 16(b) provides for the automatic recovery by corporations of profits made by insiders in short-swing transactions within a six-month period. This automatic accountability makes the rule one of relatively easy application and avoids very difficult problems concerning the measurement of damages, yet upon occasion leads to harsh results.[16] The section has been characterized as a "crude rule of thumb."[17] It is too narrow in that only short-swing trading and short selling are covered, leaving untouched other ways of profiting from inside information in the securities market. It is too broad in that short-swing trades not actually made on the basis of inside information are also caught in the Section's web of liability.[18]

The SEC has also used its full panoply of powers to police insider trading through enforcement actions and civil actions. The agency has relied, *inter alia,* on Section 17(a) of the 1933 Act, Section 15(c)(1) of the 1934 Act, and Rule 10b–5.[19] The relief obtained has included not only injunctions and suspension orders, but also disgorgement of profits earned in insider trading.

11. This term comes from Loss, *The Fiduciary Concept as Applied to Trading by Corporate "Insiders" in the United States,* 33 Mod.L.Rev. 34, 35 (1970).

12. The efficiency implications of the regulation of insider trading were the subject of an early book by Professor Henry Manne—Insider Trading and the Stock Market (1966)—which has stimulated a deluge of commentary and criticism. *See, e. g.,* W. Painter, Federal Regulation of Insider Trading (1968); Hetherington, *supra* note 9; Shotland, *Unsafe at any Price: A Reply to Manne, Insider Trading and the Stock Market,* 53 Va.L.Rev. 1425 (1967); Kripke, Book Review, 42 N.Y.U.L.Rev. 212 (1967); Loss, *supra* note 11; 5 Loss, Securities Regulation 2999–3000 (1969).

For an analysis of the topic based more directly on general economic theory, see Wu, *An Economist Looks at Section 16 of the Securities Exchange Act of 1934,* 68 Colum.L.Rev. 260 (1968). *See also* R. Posner, An Economic Analysis of the Law 308 (2d ed. 1977); Note, *The Efficient Capital Market Hypothesis, Economic Theory and the Regulation of the Securities Industry,* 29 Stan.L.Rev. 1031, 1067–75 (1977).

13. *See, e. g.,* Wu, *supra* note 12.

However, it has been suggested that insider trading may harm the securities markets in indirect ways. *See, e. g.,* Shotland, *supra* note 12; R. Posner, *supra* note 12. For one thing, outsiders might be less willing to invest in securities markets marked by the prevalence of a practice which they consider unfair. In addition an equal, if not greater degree of allocative efficiency can normally be achieved if the inside information is made public.

14. *See, e. g., Schein v. Chasen,* 478 F.2d 817, 825 (2d Cir. 1973) (Kaufman, J., dissenting); W. Painter, *supra* note 12; Hetherington, *supra* note 9; Shotland, *supra* note 12; 5 Loss, *supra* note 12; Loss, *supra* note 11.

15. *See* 2 Loss, Securities Regulation 1037–38.

16. This harshness has been partially alleviated by the SEC's use of its powers to exempt certain classes of transactions from the coverage of the section. *See, e. g.,* 17 C.F.R. §§ 2240.-16b–1 to –11.

17. *See* 2 Loss, *supra* note 15, at 1041.

18. *See id.* at 1087–90.

19. *See, e. g., Cady, Roberts & Co.,* 40 S.E.C. 907 (1961); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir. 1968).

Lastly, the "victims"[20] of insider trading may recover damages from the insiders in many instances. Absent fraud, the traditional common law approach has been to permit officers and directors of corporations to trade in their corporation's securities free from liability to other traders for failing to disclose inside information.[21] However, there has been a movement towards the imposition of a common law duty to disclose in a number of jurisdictions, at least where the insider is dealing with an existing stockholder. A few jurisdictions now require disclosure where certain "special facts" exist,[22] and some even impose a strict fiduciary duty on the insider *vis-à-vis* the selling shareholder.[23] But the most important remedies available to those injured by insider trading are found in the federal securities laws and in particular Rule 10b–5. Judicial development of a private right of action under that rule has led to significant relaxation of many of the elements of common law fraud, including privity, reliance, and the distinction between misrepresentation and non-disclosure.[24] The rule has proven a favorite vehicle for damage suits against insiders for failing to disclose material information while trading in their corporation's stock. Section 17(a) of the 1933 Act may also provide a means of recovering damages from insiders in some cases. Lastly, persons injured by insider trading may be able to take advantage of the liability sections of state securities laws. A number of states, including Indiana, have enacted laws containing antifraud provisions modeled on Rule 10b–5. *See Burns Ind.Stat. Ann.* § 23–2–1–12.

Yet, the New York Court of Appeals in *Diamond* found the existing remedies for controlling insider trading to be inadequate. Although the court felt that the device of a class action under the federal securities laws held out hope of a more effective remedy in the future, it concluded that "the desirability of creating an effective common-law remedy is manifest." 301 N.Y. S.2d at 85, 248 N.E.2d at 915. It went on to do so by engineering an innovative extension of the law governing the relation between a corporation and its officers and directors. The court held that corporate officials who deal in their corporation's securities on the basis of non-public information gained by virtue of their inside position commit a breach of their fiduciary duties to the corporation. This holding represents a departure from the traditional common law approach, which was that a corporate insider did not ordinarily violate his fiduciary

**20.** There is a good deal of ambiguity as to who should be considered a direct victim of insider trading. Those investors who actually bought from or sold securities to the insiders in face-to-face transactions may well feel cheated when they find out that the insiders were trading on the basis of material information unknown to the public. But what about traders involved in impersonal market transactions who were probably not even aware that insiders were trading in the market. These investors would have traded even if the insiders had stayed out of the market. However, if one instead asks the question of who might have acted differently if the insiders had made public their inside information at the time that they dealt with the market, these investors might be considered to have been injured by the inside trading, even if they were unaware of the insiders' activity. This latter class is capable of a variety of definitions, such as "all persons who traded at the same time as did the insiders" or, at the limit, "all persons who traded from the time that the insiders entered the market until the time that the inside information became public or was otherwise fully reflected in the stock price." *See* Fleischer, *Securities Trading and Corporate Information Practices: The Implications of the Texas Gulf Sulphur Proceedings,* 51 Va.L.Rev. 1271, 1277–78 (1965); Note, *Damages to Uninformed Traders for Insider Trading on Impersonal Exchanges,* 74 Colum.L. Rev. 299 (1974).

**21.** *See, e. g., Board of Comm'rs of Tippecanoe Co. v. Reynolds,* 44 Ind. 509 (1873); *Percival v. Wright,* [1902] 2 Ch. 421; *see also* Conant, *Duties of Disclosure of Corporate Insiders Who Purchase Shares,* 46 Cornell L.Q. 53 (1960); Loss, *supra* note 11, at 40–41.

**22.** *See, e. g. Strong v. Repide,* 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853 (1909). *See also,* Conant, *supra* note 21; 3 Loss, Securities Regulation 1446–47 (1961).

**23.** *See, e. g., Oliver v. Oliver,* 118 Ga. 362, 45 S.E. 232 (1903). *See also* Conant, *supra* note 21; 3 Loss, *supra* note 22.

**24.** *See generally* Bromberg, Securities Law: Fraud (1977).

duty to the corporation by dealing in the corporation's stock, unless the corporation was thereby harmed.[25]

The *Diamond* court relied heavily on the Delaware case of *Brophy v. Cities Service Co.,* 31 Del.Ch. 241, 70 A.2d 5 (1949), the most significant departure from the traditional common law approach prior to *Diamond* itself. There, the confidential secretary to a director of a corporation purchased a number of shares of the company's stock after finding out that the corporation was about to enter the market to make purchases of its stock itself, and then sold at a profit after the corporation began its purchases. The Delaware Court of Chancery upheld the complaint in a derivative action on behalf of the corporation to recover those profits. The court stated that the employee occupied a position of trust and confidence toward his employer and that public policy would not permit him to abuse that relation for his own profit, regardless of whether or not the employer suffered a loss. 70 A.2d at 8. The *Diamond* court also relied on Section 388 of the Restatement (Second) of Agency. Although the section itself somewhat ambiguously speaks of profits made by an agent in connection with "transactions conducted by him on behalf of the principal," Comment c sets down a broad rule:

> An agent who acquires confidential information in the course of his employment . . . has a duty to account for any profits made by the use of such information, although this does not harm the principal. Thus, where a corporation has decided to operate an enterprise at a place where land values will be increased because of such operation, a corporate officer who takes advantage of his special knowledge to buy land in the vicinity is accountable for the profits he makes, even though such purchases have no ad-

verse effect upon the enterprise. So, if he has "inside" information that the corporation is about to purchase or sell securities, or to declare or to pass a dividend, profits made by him in stock transactions undertaken because of his knowledge are held in constructive trust for the principal.

Accordingly, the *Diamond* court at least impliedly assimilated inside information to a corporate asset with respect to which corporate officers and directors owe the corporation a duty of loyalty.

There are a number of difficulties with the *Diamond* court's ruling. Perhaps the thorniest problem was posed by the defendants' objection that whatever the ethical status of insider trading, there is no injury to the corporation which can serve as a basis for recognizing a right of recovery in favor of the latter. The Court of Appeals' response to this argument was two-fold, suggesting first that no harm to the corporation need be shown and second that it might well be inferred that the insiders' activities did in fact cause some harm to the corporation. With respect to the first point the court stated:

> It is true that the complaint before us does not contain any allegation of damages to the corporation, but this has never been considered to be an essential requirement for a cause of action founded on a breach of fiduciary duty. (See, e. g., *Matter of People [Bond & Mrge. Guar. Co.],* 303 N.Y. 423, 431, 103 N.E.2d 721, 725; *Wendt v. Fisher,* 243 N.Y. 439, 443, 154 N.E. 303, 304; *Dutton v. Willner,* 52 N.Y. 312, 319.) This is because the function of such an action, unlike an ordinary tort or contract case, is not merely to compensate the plaintiff for wrongs committed by the defendant but, as this court declared many years ago (*Dutton v. Willner,* 52 N.Y. 312, 319, *supra* ), "to prevent

---

**25.** *See Adams v. Mid-West Chevrolet Corp.,* 198 Okl. 461, 469–70, 179 P.2d 147, 156 (1946):
> The general rule is that officers and directors . . . cannot deal with the property of the corporation for their own personal benefit or advantage. But this duty does not extend to the outstanding stock of the corporation for

the reason that such stock is the individual property of the respective shareholders and not in any sense the corporation's property. *See also* 3 Fletcher Cyclopedia Corporations § 900 (1975); Note, 55 Va.L.Rev. 1520, 1522–24; Conant, *supra* note 21, at 54–56.

them, by removing from agents and trustees all inducement to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency or trust relates." (Emphasis supplied.)

Just as a trustee has no right to retain for himself the profits yielded by property placed in his possession but must account to his beneficiaries, a corporate fiduciary, who is entrusted with potentially valuable information, may not appropriate that asset for his own use even though, in so doing, he causes no injury to the corporation. The primary concern, in a case such as this, is not to determine whether the corporation has been damaged but to decide, as between the corporation and the defendants, who has a higher claim to the proceeds derived from the exploitation of the information.

301 N.Y.S.2d at 81, 248 N.E.2d at 912. Some might see the *Diamond* court's decision as resting on a broad, strict-trust notion of the fiduciary duty owed to the corporation: no director is to receive any profit, beyond what he receives from the corporation, solely because of his position.[26] Although, once accepted, this basis for the *Diamond* rule would obviate the need for finding a potential for injury to the corporation, it is not at all clear that current corporation law contemplates such an extensive notion of fiduciary duty.[27] It is customary to view the *Diamond* result as resting on a characterization of inside information as a corporate asset. The lack of necessity for looking for an injury to the corporation is then justified by the traditional "no inquiry" rule with respect to profits made by trustees from assets belonging to the trust *res*.[28] However, to start from the premise that all inside information should be considered a corporate

asset may presuppose an answer to the inquiry at hand. It might be better to ask whether there is any potential loss to the corporation from the use of such information in insider trading before deciding to characterize the inside information as an asset with respect to which the insider owes the corporation a duty of loyalty (as opposed to a duty of care). This approach would be in keeping with the modern view of another area of application of the duty of loyalty—the corporate opportunity doctrine. Thus, while courts will require a director or officer to automatically account to the corporation for diversion of a corporate opportunity to personal use, they will first inquire to see whether there was a possibility of a loss to the corporation—i. e., whether the corporation was in a position to potentially avail itself of the opportunity—before deciding that a corporate opportunity in fact existed.[29] Similarly, when scrutinizing transactions between a director or officer and the corporation under the light of the duty of loyalty, most courts now inquire as to whether there was any injury to the corporation, i. e., whether the transaction was fair and in good faith, before permitting the latter to avoid the transaction.[30] An analogous question might be posed with respect to the *Diamond* court's unjust enrichment analysis: is it proper to conclude that an insider has been unjustly enriched *vis-à-vis* the corporation (as compared to other traders in the market) when there is no way that the corporation could have used the information to its own profit, just because the insider's trading was made possible by virtue of his corporate position?

Not all information generated in the course of carrying on a business fits snugly into the corporate asset mold. Information in the form of trade secrets, customer lists,

26. *See* Note, 83 Harv.L.Rev. 1421, 1429 (1970). *See also* the discussion of the *"quid pro quo"* basis for a "no inquiry" rule with respect to a fiduciary's duty of loyalty in Bayne, *Corporate Control as a Strict Trustee*, 53 Ga.L.J. 543, 576–82 (1965).

27. *See,* Note, 83 Harv.L.Rev. 1421, 1429 n.36 (1970); Hetherington, *supra* note 9, at 731.

28. *See Schein v. Chasen,* 478 F.2d 817 (2d Cir. 1973); Conant, *supra* note 21; Note, 1 J.Corp.L. 83 (1975).

29. *See* Fletcher Cyclopedia Corporations, §§ 861 to 862.1 (1975).

30. *Id.* § 931.

etc., can easily be categorized as a valuable or potentially valuable corporate "possession," in that it can be directly used by the corporation to its own economic advantage.[31] However, most information involved in insider trading is not of this ilk, e. g., knowledge of an impending merger, a decline in earnings, etc. If the corporation were to attempt to exploit such non-public information by dealing in its own securities, it would open itself up to potential liability under federal and state securities laws, just as do the insiders when they engage in insider trading. This is not to say that the corporation does not have any interests with regard to such information. It may have an interest in either preventing the information from becoming public[32] or in regulating the timing of disclosure.[33] However, insider trading does not entail the disclosure of inside information, but rather its use in a manner in which the corporation itself is prohibited from exploiting it.

Yet, the *Diamond* court concluded that it might well be inferred that insider trading causes some harm to the corporation:

> Although the corporation may have little concern with the day-to-day transactions in its shares, it has a great interest in maintaining a reputation of integrity, an image of probity, for its management and in insuring the continued public acceptance and marketability of its stock. When officers and directors abuse their position in order to gain personal profits, the effect may be to cast a cloud on the corporation's name, injure stockholder relations and undermine public regard for the corporation's securities. As Presiding Justice Botein aptly put it, in the course of his opinion for the Appellate Division, "[t]he prestige and good will of a corporation, so vital to its prosperity, may be undermined by the revelation that its chief officers had been making personal

profits out of corporate events which they had not disclosed to the community of stockholders."

301 N.Y.S.2d at 81, 82, 248 N.E.2d at 912–13. It must be conceded that the unfairness that is the basis of the widespread disapproval of insider trading is borne primarily by participants in the securities markets, rather than by the corporation itself. By comparison, the harm to corporate goodwill posited by the *Diamond* court pales in significance. At this point, the existence of such an indirect injury must be considered speculative, as there is no actual evidence of such a reaction. Furthermore, it is less than clear to us that the nature of this harm would form an adequate basis for an action for an accounting based on a breach of the insiders' duty of loyalty, as opposed to an action for damages based on a breach of the duty of care. The injury hypothesized by the *Diamond* court seems little different from the harm to the corporation that might be inferred whenever a responsible corporate official commits an illegal or unethical act using a corporate asset. Absent is the element of loss of opportunity or potential susceptibility to outside influence that generally is present when a corporate fiduciary is required to account to the corporation.

The *Brophy* case is capable of being distinguished on this basis. Although the court there did not openly rely on the existence of a potential harm to the corporation, such a harm was possible. Since the corporation was about to begin buying its own shares in the market, by purchasing stock for his own account the insider placed himself in direct competition with the corporation. To the degree that his purchases might have caused the stock price to rise, the corporation was directly injured in that it had to pay more for its purchases. The other cases cited by the *Diamond* court also

---

**31.** *See id.* § 857.1.

**32.** The *Texas Gulf Sulphur* case provides a good example of such an interest. If news of the ore strike had become public the corporation would have found it more expensive to buy up the surrounding parcels of land.

**33.** For example, premature publication of certain inside information might lead to problems with respect to stock offerings or to liability under the securities laws.

tended to involve an agent's competition with his principal, harm to it, disregard for its instructions, or the like.[34] The same is true of the situations covered in Comment c of the Restatement (Second) of Agency, with the exception of the case where the corporate agent undertakes stock transactions on the basis of knowledge that the corporation is about to declare or pass a dividend.

A second problem presented by the recognition of a cause of action in favor of the corporation is that of potential double liability. The *Diamond* court thought that this problem would seldom arise, since it thought it unlikely that a damage suit would be brought by investors where the insiders traded on impersonal exchanges. The court further reasoned that:

> It is not unusual for an action to be brought to recover a fund which may be subject to a superior claim by a third party. If that be the situation, a defendant should not be permitted to retain the fund for his own use on the chance that such a party may eventually appear. A defendant's course, if he wishes to protect himself against double liability, is to interplead any and all possible claimants and bind them to the judgment (CPLR 1006, subd. [b]).

301 N.Y.S.2d at 86, 248 N.E.2d at 915. The Second Circuit also gave consideration to the possibility of double liability in *Schein v. Chasen,* 478 F.2d at 824–25, but concluded that double liability could be avoided by methods such as that employed in *SEC v. Texas Gulf Sulphur Co.,* 312 F.Supp. 77, 93 (S.D.N.Y.1970), where the defendants' disgorged profits were placed in a fund subject first to the claims of injured investors,

with the residue payable to the corporation. The efficacy of the *Diamond* court's suggestion of resort to an interpleader action is open to question.[35] The creation of a fund subject to the superior claims of injured investors also poses some difficulties.[36] Although some observers have suggested that double liability be imposed so as to more effectively deter insider trading and that it is analytically justifiable since the two causes of action involved are based on separate legal wrongs,[37] the *Diamond* and *Schein* courts' concern for avoiding double liability may implicitly reflect the view that a right of recovery in favor of the corporation was being created because of the perceived likelihood that the investors who are the true victims of insider trading would not be able to bring suit. When the latter in fact bring an action seeking damages from the insiders, thereby creating the possibility of double liability, the need for a surrogate plaintiff disappears and the corporation's claim is implicitly relegated to the back seat.

Since the *Diamond* court's action was motivated in large part by its perception of the inadequacy of existing remedies for insider trading, it is noteworthy that over the decade since *Diamond* was decided, the 10b–5 class action has made substantial advances toward becoming the kind of effective remedy for insider trading that the court of appeals hoped that it might become. Most importantly, recovery of damages from insiders has been allowed by, or on the behalf of, market investors even when the insiders dealt only through impersonal stock exchanges,[38] although this is not yet a well-settled area of the law. In spite of other recent developments indicating that such class actions will not become as easy to

---

34. Note, 83 Harv.L.Rev. 1421, 1429 n.35 (1970).

35. *See* Note 55 Va.L.Rev. 1520, 1531 n.51 (1969); Note, 74 Colum.L.Rev. 269, 293–94 (1974).

36. *See* Note, 74 Colum.L.Rev. 269, 291–92 (1974), where it was suggested that since in many cases the claims of injured investors might completely deplete the fund, the corporation might eventually end up poorer for having won the suit because of the costs of litigation.

37. *See, e. g.,* Conant, *supra* note 21; Note, 74 Colum.L.Rev. 269, 292–93 (1974).

38. *See, e. g., Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 353 F.Supp. 264 (S.D.N. Y.1972), *aff'd,* 495 F.2d 228 (2d Cir. 1974); *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301 (2d Cir.), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971); *SEC v. Shapiro,* 494 F.2d 1301, 1309 (2d Cir. 1974); *cf. Fridich v. Bradford,* 542 F.2d 307 (6th Cir. 1976).

maintain as some plaintiffs had perhaps hoped,[39] it is clear that the remedies for insider trading under the federal securities laws now constitute a more effective deterrent than they did when *Diamond* was decided.

█ Plaintiff cites a number of Indiana cases in support of her argument that the Indiana courts would follow *Diamond* if the question were presented to them. However, these cases merely establish that Indiana imposes certain fiduciary duties on officers and directors and protects corporate opportunities, as do other states. They do not answer the question at issue here of whether the New York Court of Appeals' innovative ruling in *Diamond* will be followed by Indiana.[40] Defendants, on the other hand, argue that the early Indiana Supreme Court case of *Board of Commissioners of Tippecanoe Co. v. Reynolds,* 44 Ind. 509 (1873), in which it was held that a director is not subject to any duty to disclose inside information to a shareholder from whom he is buying stock, is inconsistent with the adoption of a *Diamond*-type cause of action. The two cases are distinguishable in that one deals with fiduciary duties owed by an insider to a selling stockholder while the other deals with the duty owed to the corporation itself. Yet, it seems somewhat unlikely that a common law jurisdiction not directly protecting a selling shareholder from insider trading would go on to create a cause of action in favor of the corporation. Indiana has since enacted securities laws containing antifraud provisions. It should also be noted that *Board of Commissioners* has not been the subject of reaffirmation during the past century and that there have been sugges-

tions from the Indiana bar that it be overruled.[41] We would thus be hesitant to base our decision solely on this case. However, having carefully examined the decision of the New York Court of Appeals in *Diamond,* we are of the opinion that although the court sought to ground its ruling in accepted principles of corporate common law, that decision can best be understood as an example of judicial securities regulation.[42] Although the question is a close one, we believe that were the issue to be presented to the Indiana courts at the present time, they would most likely join the Florida Supreme Court in refusing to adopt the New York court's innovative ruling.

II.

*The Lack of a Factual Basis for Plaintiff's Claims*

█ In addition to concluding that Indiana would not recognize a *Diamond*-type cause of action, the district court found that there was no genuine dispute as to whether the defendants' sales of Skyline stock were based on material inside information. In determining whether summary judgment was appropriate the trial judge was presented with a large number of affidavits, documents and extracts of depositions emerging out of three years of extensive discovery. If the defendants' affidavits and exhibits effectively controverted the allegations of the plaintiff's complaint, under Fed.R.Civ.P. 56(e) the plaintiff may no longer rely on those allegations alone in demonstrating that there is a genuine issue of material fact. Instead, the plaintiff must point to portions of affidavits, depositions, etc., constituting "significant proba-

**39.** *See Eisen v. Carlisle & Jacquelin,* 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1966); *Hochfelder v. Ernst & Ernst,* 425 U.S. 909, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1975).

**40.** As was pointed out by Justice Frankfurter in *SEC v. Chenery Corp.,* 318 U.S. 80, 85, 63 S.Ct. 454, 458, 87 L.Ed.2d 626 (1943):
　　[T]o say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what

respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty?

**41.** *See* Ryan, *Should Tippecanoe County Commr's v. Reynolds Be Overruled?* 16 Ind.L.J. 563 (1941). It also appears that one Indiana Court of Appeals believes that this will occur. *Krull v. Pierce,* 117 Ind.App. 638, 647, 71 N.E.2d 617 (1947).

**42.** *Accord,* Note, 83 Harv.L.Rev. 1421 (1970).

tive evidence tending to support the complaint." *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1967). We agree with the trial court that the plaintiff here has failed to do so.

Before turning to a closer examination of the facts involved in the two instances of trading on the basis of inside information alleged by plaintiff, we will deal with her assertion that the district court erred in considering evidence of the defendants' past patterns of sales of Skyline stock and their motivations for making the sales in question. Plaintiff argues that these matters are irrelevant in that they do not constitute a defense to a showing that the defendants sold stock without disclosing material inside information in their possession. It may well be true that liability would not be legally precluded,[43] but the evidence may still be relevant to the question of whether the insiders were trading on the basis of inside information in the first place. That is the case here.[44]

We turn next to plaintiff's allegations of insider trading during the quarters ending May 31 and August 31, 1972. Plaintiff alleges that the financial results for these two quarters significantly understated Skyline's material costs for those quarters and therefore overstated earnings. It is further alleged that Decio, Swikert, Kaufman and Mandell made sales and gifts of Skyline stock totalling nearly $10 million at various times during those two quarters, knowing that these results were misstated.[45] The defendants introduced the affidavit of Skyline's chief financial officer stating that the reported financial results for these two quarters were properly prepared and accurate. The district court apparently granted the defendants' motion for summary judgment with respect to this claim on the ground that the plaintiff was unable to point to any significant probative evidence outside of her pleadings controverting the defendants' evidence. We agree. Plaintiff has not come forward with any specific evidence in support of her theory that the cost of sales for the two quarters were understated, such as indications of inaccuracies in the supporting documents, unrecorded invoices, or a failure to follow generally accepted accounting principles in preparing the financial statements. Her major argument is that the ratio of total reported material costs to total sales revenue (the material cost percentage) declined during those two quarters as compared to the previous quarter. Since Skyline's raw material prices were allegedly increasing during this period, which would lead to a rising rather than falling material cost percentage all other things being equal, plaintiff concludes

**43.** Even if the defendants could show that they would have traded even absent the inside information, there remains the fact that by failing to disclose material facts not publicly available, they place themselves in a position of unfair advantage *vis-à-vis* the other traders in the market. We need not consider now the degree to which the significance of this conclusion is altered by the fact that a *Diamond*-type action is rooted in the insiders' fiduciary duties to the corporation rather than to other investors.

**44.** When it is shown that an insider made a sudden sale of a significant portion of his holdings of his corporation's stock and that subsequently, material adverse information became public concerning the corporation which led to a significant drop in the price of the stock, an inference arises that the insider was "bailing out" on the basis of material inside information. However, this inference can be nullified by a showing that sales in question were consistent in timing and amount with a past pattern of sales or that other circumstances might

reasonably account for their occurrence. Hence, the district court was correct to consider these factors.

**45.** Plaintiff's theory is on its face inadequate to support a recovery of defendants' profits with respect to sales which occurred during the quarter ending May 31, 1972. The defendants could not possibly have known that the financial statements for that quarter were misstated until they came into existence. This could not have occurred earlier than the end of the quarter, since the necessary accounting data would not have been fully available until that time. Nor is there any allegation or evidence suggesting that during the May 31 quarter any defendant had the intention of causing the end of period financial statements to be misstated or knew that some piece of accounting data already in existence was inaccurate and would be incorporated into the end-of-quarter statements, thereby causing them to be inaccurate.

that the reported material costs must be understated. Defendants, however, have demonstrated that plaintiff's *ceteris paribus* assumption is not justified, leaving the inference to be drawn too weak to effectively controvert the other evidence attesting to the accuracy of the reported statements.[46]

Plaintiff's only other argument in support of her assertion that the reported material costs for these two periods were misstated is that they are less than hypothetical "correct" costs calculated by plaintiff using a simple profit-volume formula based on costs from the previous quarter. This argument is really a variant of plaintiff's argument concerning Skyline's material cost percentages.[47] Whatever the utility of a simple profit-volume analysis as a cost accounting tool in a relatively stable, single-product firm or when great accuracy is not required, in the circumstances of this case the margin of possible error is too great for the application of the technique to be sufficiently probative to controvert the defendants' affidavits and other evidence.[48] Moreover, even if we were to find that plaintiff has managed to create a genuine dispute as to whether the May and August

financial statements were misstated, she has presented no evidence to counter the defendants' sworn averments that they did not believe them to be inaccurate.

There remain the plaintiff's allegations that between September 7 and December 21, 1972, Decio and Mandell sold Skyline stock worth approximately $4 million, knowing that reported earnings for the quarter ending November 30 would decline. There are no allegations that the decline in earnings was known by the defendants as an "accounting fact," as was the case in *Diamond v. Oreamuno, supra.* In other words, there is no suggestion that the defendants had received accounting reports representing the actual results for the November quarter, showing a decline, and that they then sold Skyline stock before the earnings figures were released to the public. The plaintiff's argument here is more circuitous. To paraphrase: the evidence shows that the decline in reported earnings for the November quarter was due in large part to increases in material costs, particularly lumber, which the corporation was not able to offset through higher prices for its

46. The defendants demonstrated that the decline in the material cost percentage can be attributed to secular changes in Skyline's product mix. During the period in question Skyline found that its customers were tending to buy larger and more expensive mobile homes, recreational vehicles and optional equipment, all of which carried higher gross profit margins and therefore lower material cost percentages. When the material cost percentage for the May 31 and August 31 quarters turned out to be less than the amount budgeted, Decio had the variances investigated and became convinced that they could be explained by the change in product mix. Accordingly, the budgeted material cost percentage for the next quarter (ending November 30, 1972) was lowered with respect to the budgeted costs for the comparable quarter of the previous year. Plaintiff's rebuttal that the change in product mix between mobile homes and recreational vehicles does not fully explain the decline in average material cost percentage is incomplete in that it does not take into account changes in product mix within each of those two larger categories leading to a lower material cost percentage for each category as a whole.

47. Since plaintiff's formula calculates a hypothetical May quarter material cost by multiplying the February quarter material cost by a

ratio derived by relating May sales to February sales, the February material cost percentage is effectively "locked into" the hypothetical result, thereby creating a disparity with the actual results which is a manifestation of the decline in the actual material cost percentage due to the change in product mix and cost efficiencies.

48. *See generally* Dopuch & Birnberg, Cost Accounting: Accounting Data for Management's Decisions, Chs. 1 and 4 (1969 ed.).

In addition to the very major problems concerning changes in the product mix plaintiff assumes, without explanation, that the variable cost figures from an exhibit to a Skyline submission to the Cost of Living Council are the appropriate ones. However, given the difficulty of allowing for semi-fixed and semi-variable costs and the relatively modest need for great precision in the computations involved in the Cost of Living Council exhibit, we find credible the defendants' argument that the instructions for completing the exhibit over-simplify the classification of costs and probably overstated the percentage of total costs that were variable. Plaintiffs presented no evidence to the contrary.

end products because of price controls; there is evidence that the defendants were aware of the price increases in lumber and related products, and that economic controls had caused Skyline to lose pricing "flexibility;" therefore, the defendants must have known that reported earnings for the quarter would decline. The district court rejected the plaintiff's contentions on the grounds that there was no evidence that the defendants actually made any such pessimistic predictions, that the existence of rising lumber prices and price controls were publicly known, and that economic predictions of the type in question do not constitute material inside information.

Plaintiff has shown that certain of the defendants were aware of the fact that lumber prices had increased and also knew of the existence of price controls. However, we agree with the court below that these "facts" cannot be considered "inside" corporate information in light of their wide public availability,[49] even though the defendants might have been in a better position to evaluate the potential impact of these developments on Skyline earnings. Plaintiff has also presented evidence suggesting that certain of the defendants knew that the combination of rising material costs and price controls had caused Skyline to lose "flexibility" and that gross profit margins were likely to come under pressure. An analogous inference could have been easily drawn from the publicly available information concerning lumber prices and

price controls. However, the defendants take the position that in spite of these developments, they expected profits for the November quarter to exceed those of the comparable quarter of the previous year because of anticipated increases in sales. The actual increase in sales then fell short of the predictions. In support of their contentions the defendants point to their sworn affidavits and testimony, and other evidence. Their anticipation of record profits was also consistent with contemporaneous internal documents predicting record sales and earnings. We agree with the district court that in the face of this documentation plaintiff has been unable to produce any significant probative evidence controverting the defendants' assertions in spite of three years of discovery.[50]

 Even if we were to agree with the plaintiff's contention that there is a sufficient dispute concerning the defendants' expectations with regard to Skyline's future earnings so as to warrant a bench trial, we would join in the trial court's conclusion that the "predictions" in question do not constitute material inside information in the circumstances of this case. In nondisclosure cases under Rule 10b–5 it has been suggested that "nondisclosure of predictions will not normally break the Rule." A. Bromberg, Securities Law: Fraud § 8.2 at 197–98 (1977). We believe that a similar conclusion is appropriate in a *Diamond*-type cause of action. Although it has been stated that statements in a tender offer

49. Plaintiff argues that there is no indication that there was public knowledge of price increases for materials other than lumber and lumber related products. However, there is also no evidence that such other cost increases materially contributed to Skyline's earnings drop when balanced against other prices that were declining. Nor is there any evidence that the defendants were aware of any significant price increases other than for lumber and related products.

50. Plaintiff points out that the decline in earnings experienced in the November, 1972, and subsequent quarters was largely attributed to rising material costs in the Skyline press releases of the time. With the clarity of hind-

sight plaintiff also suggests that the actual deterioration in Skyline's gross margins during the November quarter was so pronounced that earnings would have declined even if sales had lived up to expectations. However, plaintiff does not attempt to specify the extent to which the actual deterioration in the gross margin was in fact, or should have been, anticipated by the defendants, other than to suggest that the defendants were aware of some imminent deterioration. There is thus no evidence directly controverting the defendants' assertions that they expected record sales and profits in spite of increasing material costs or suggesting that such a belief would have been unreasonable in light of information existing at the time.

relating to a prospective event may be material, *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 251 (2d Cir. 1973), the Second Circuit has also suggested that there are limits on the kinds of information which may form the basis of liability in nondisclosure cases:

> Nor is an insider obligated to confer upon outside investors the benefit of his superior financial or other expert analysis by disclosing his *educated guesses or predictions*. 3 Loss, [Securities Regulation] *supra* at 1463. The only regulatory objective is that access to material information be enjoyed equally, but this objective requires nothing more than the disclosure of basic facts so that outsiders may draw upon their own evaluative expertise in reaching their own investment decisions with knowledge equal to that of the insiders. (Emphasis added.)

*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968). Here, the existence of rising lumber prices and price controls constituted information already available to the public. This information readily led to an inference that gross profit margins might decline. The fact that the defendants may have been in a position to better judge the impact of these factors on Skyline's earnings because of their greater familiarity with the corporation's affairs does not mean that they should be held liable for failing to educate the public. The disclosure of earnings predictions has traditionally been disfavored by the SEC on the grounds that the reliance placed in them may not be justified by their reliability.[51] Nor is this a case in which the earnings prediction was of a high probability and was accompanied by "hard" information on interim earnings, sales, or changing cost structures itself material and not available to the public. *See* A. Bromberg, *supra*, § 7.4(2) at 168.2; *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228 (2d Cir. 1974).

## III.

### *The Section 16(b) Claim Against Swikert*

In 1968, Swikert was granted the right to acquire 18,000 shares of Skyline stock under the corporation's Management Incentive Plan. At that point in time he became committed to acquire the stock and paid for it. However, the stock was subject to restrictions on resale for five years, at the end of which period Swikert sold part of the shares. Plaintiff argues that Swikert "purchased" the stock within the meaning of Section 16(b) of the Securities Exchange Act at the time that the restrictions lapsed. However, it is well settled that an insider acquires stock for the purposes of 16(b) when he has "incurred an irrevocable liability to take and pay for the stock" and his "rights and obligations become fixed." *Blau v. Ogsbury*, 210 F.2d 426, 427 (2d Cir. 1954); *Silverman v. Landa*, 306 F.2d 422, 424 (2d Cir. 1962). We agree with the district court's conclusion that this took place in the case at bar in 1968 when the stock was contracted for and paid for, and not in 1973 when the restrictions lapsed and the certificates were delivered. Since there was therefore no purchase within six months of any sale, there is no liability under Section 16(b) and it is irrelevant whether the restricted stock came within the exemption set out in Rule 16b–3.

The judgment of the district court is AFFIRMED.

---

**51.** Schneider, *Nits, Grits, and Soft Information in SEC Filings*, 121 U.Pa.L.Rev. 254 (1972). Nevertheless, the author advocates more disclosure of earnings predictions.