**Harry STERMAN; Etta K. Steiner, Plaintiffs-Appellants,**

v.

**FERRO CORPORATION; Albert Bersticker; Willard W. Brown; James M. Dawson; Robert N. Ginn; Clyde A. Macfie; Donald E. Noble; Kevin O'Donnell; Henry G. Piper; Adolph Posnick; Robert Roy White; and Crane Company, Defendants-Appellees.**

No. 84–3632.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 6, 1985.

Decided March 10, 1986.

Alan L. Melamed, Beachwood, Ohio, Mark M. Rottenberg, Jeffrey G. Smith, Daniel W. Krasner (argued), New York City, for plaintiffs-appellants.

Phillip A. Contreras, Cleveland, Ohio, for Ferro Corp.

James A. Smith (argued), James P. Murphy, Frank DiPiero, Squire, Sanders & Dempsey, Richard Cusick, Robert N. Rapp, Calfee, Halter & Griswold, Cleveland, Ohio, for defendants-appellees.

Before ENGEL and KRUPANSKY, Circuit Judges, and GIBBONS, District Judge*.

KRUPANSKY, Circuit Judge.

Plaintiffs/appellants Harry Sterman and Etta K. Steiner (plaintiffs) appealed from the district court order granting a summary judgment in favor of the defendants, which dismissed plaintiffs' derivative claim

* Hon. Julia S. Gibbons, District Judge, United States District Court for the Western District of Tennessee, sitting by designation.

for recovery of short swing profits under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b).[1]

The facts giving rise to this cause of action are basically undisputed. Between early 1981 and November 1982 defendant Crane Co. (Crane), through its chairman Thomas Evans (Evans), acquired 1,733,220 (or 22.4%) shares of Ferro Corporation (Ferro) common stock at prices ranging from $22 to $27 per share.[2]

In December 1981, Adolph Posnick (Ferro's president and a director) informed Ferro's board of directors that Ferro's management intended to initiate discussions with Crane to explore repurchasing Ferro stock owned by Crane. Posnick's effort to meet with Crane was unsuccessful. In late spring of 1982, at the request of the board of directors, Milton Rosenthal (Rosenthal) (a Ferro director and acquaintance of Evans for more than twenty years) arranged a November 3, 1982 meeting between Evans, Posnick and Rosenthal at Evans' office in New York to discuss a possible repurchase of the Ferro stock held by Crane.

During the scheduled meeting, Posnick offered to repurchase the Ferro shares at the then current market price. Evans demanded a higher price of $35 per share. Tentatively, the parties reached accord at a repurchase price of $30 per share plus a $.30 per share dividend payable on December 10, 1982 to all shareholders of record as of the close of business on November 15, 1982. The $30.30 repurchase price dis-

cussed by the parties was only tentative since Ferro's board of directors had not considered or acted upon the proposal.

Shortly after the November 3, 1982 meeting but prior to any action by Ferro's board of directors, Evans telephoned Rosenthal to advise him that, upon reconsideration, Crane could not agree to the discussed $30.30 per share price of Ferro Stock because of the short swing profit liability which would attach to the transaction. At that juncture of the negotiations Ferro was confronted with the dilemma of paying a higher price per share or terminating further negotiations. Exercising its business judgment, Ferro elected to continue the negotiations. Rosenthal advised Crane that Ferro would consider increasing the purchase price per share to permit Crane to net $30.30 per share after discharging its 16(b) liability. Evans responded favorably and the parties again reached a tentative agreement, subject to a final approval by the Ferro board of directors.

On November 8, 1982, the Ferro board of directors convened to consider the proposed offer of repurchase as negotiated by Rosenthal. The board of directors duly approved the offer of repurchase authorizing the payment of $31.03 per share of stock. The transaction resulted in an additional payment to Crane of $1,260,975, the precise amount of the short swing profit liability required to be paid to Ferro in satisfaction of the Section 16(b) liability that attached to the repurchase of the Ferro shares by Crane.[3]

1. Section 16(b) U.S.C. § 78p(b) provides in pertinent part:

   For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months ... shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months....

2. Of the entire block of 1,733,220 shares of Ferro stock accumulated by Crane, 1,568,200 shares, or over 90% had been acquired by Crane prior to the six month period ending November 8, 1982. Thus, only the remaining 10% could conceivably be subject to 16(b) liability.

3. As previously noted, Crane acquired a total of 1,733,200 shares of Ferro stock. Of this total, however, only 165,000 shares were purchased within the six-month period ending on November 8, 1982, and were thus the only shares subject to section 16(b) liability. The aggregate cost to Crane of these 165,000 shares was $3,858,975, or an average price of $23.387727 per share. When the 165,000 shares were sold to Ferro for $31.03 per share on November 8,

The transaction was finalized on November 8, 1982 whereupon Ferro demanded a return of Crane's adjusted short swing profits. On November 11, 1982, Crane delivered a check to Ferro in the amount of $1,260,975, thereby discharging its 16(b) liability.

Plaintiffs brought suit against Ferro, ten individual directors of Ferro and Crane alleging that the transaction constituted an illegal waiver of short swing profits by the directors of Ferro because the November 3 agreement, contrary to the contentions of Crane and Ferro, was an irrevocable commitment between the parties fixing the repurchase price of Ferro stock at $30.30 per share; consequently, plaintiffs alleged, the difference between the $30.30 per share and the subsequently negotiated increased price per share of $31.31 arrived at on November 8 was an illegal payment to Crane approved by Ferro's Board of Directors and a breach of the Board's fiduciary duty to its stockholders. The district court rejected the plaintiffs' arguments and granted defendants' motion for summary judgment, concluding that the November 3 negotiations had not resulted in a purchase or sale for purposes of Section 16(b) since Crane had not been irrevocably committed to sell its shares to Ferro until November 8, 1982, the date upon which the Ferro board formally approved the offer. The trial court reasoned that the discussions between the parties during the pertinent intervening time interval merely constituted continuing negotiations to arrive at a mutually acceptable repurchase price for the shares at issue albeit that the ultimate repurchase price per share accommodated the short swing profits imposed by Section 16(b). The district court further determined that even if the principal officers of Ferro and Crane had arrived at an agreement prior to November 8, it would not have been legally binding inasmuch as under both Ohio law and Ferro's Articles of Incorporation, only the board of directors could authorize Ferro to repurchase its

own shares. In response to the plaintiffs' allegations that Crane sought to avoid its Section 16(b) liability, the district court noted that Crane recognized and conceded its liability under that section and simply negotiated a higher repurchase price per share of Ferro stock.

Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), "provides that officers, directors, and holders of more than 10% of the listed stock of any company shall be liable to the company for any profits realized from any purchase and sale or sale and purchase of such stock occurring within a period of six months." *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 583–84, 93 S.Ct. 1736, 1739, 36 L.Ed.2d 503 (1973); *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 419, 92 S.Ct. 596, 597, 30 L.Ed.2d 575 (1972).

In enacting Section 16(b), Congress recognized that insiders could have access to information about their corporations not available to the trading public generally. "By trading on this information, these persons could reap profits at the expense of less well informed investors." *Foremost-McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 243, 96 S.Ct. 508, 516, 46 L.Ed.2d 464 (1976). The statute states that its purpose is to prevent "the unfair use of information which may have been obtained by such beneficial owner ... by reason of his relationship to the issuer."

In Section 16(b), Congress sought to curb one of the evils of insider trading by "taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." *Reliance Electric Co., supra*, 404 U.S. at 422, 92 S.Ct. at 599. It accomplished this result by defining directors, officers, and beneficial owners of 10% of a corporation as a class of persons presumed to have access to inside information and enacted an absolute prohibition preventing such persons from

1982, the average profit derived by Crane on each of the 165,000 shares was $7.642273, or an aggregate profit of $1,260,975. It was this

amount which was to be paid to Ferro by Crane in discharge of its section 16(b) liability.

profiting "from any purchase and sale or sale and purchase of any equity security of such issues (other than an exempted security) within any period of less than six months ...". 15 U.S.C. § 78p(b); *see also, Foremost-McKesson, Inc., supra,* 423 U.S. at 244–45, 96 S.Ct. at 516.

On appeal, to bring the transaction within the confines of Section 16(b), plaintiffs argue that the transaction here in issue violated Section 16(b) because officers and directors of Ferro disclosed inside information to Crane which permitted it to realize a substantial profit from the stock repurchase agreement. Plaintiffs reason that initial acquisitions of the Ferro stock by Evans stimulated speculation of a hostile takeover of Ferro which caused grave concern and apprehension amongst its directors. Plaintiffs further conjecture that Posnick's initial inquiry of Evans concerning the repurchase of Ferro stock conveyed Ferro's apprehension of an impending hostile takeover which prompted Evans to acquire additional shares of Ferro stock thereby unnerving and undermining Ferros management and directors, thus motivating them to pay a highly inflated repurchase price for Ferro stock.

However, the facts as characterized by the plaintiffs, even if true, are irrelevant. Section 16(b) imposes a strict liability upon transactions coming within its parameters and this court has long recognized that consideration of issues such as motive, intent and the use or abuse of inside information is irrelevant in analyzing actions under its mandates.[4] *See Ferraiolo v. Newman,* 259 F.2d 342, 344 (6th Cir.1958), and cases

cited therein. As the Court stated in *Reliance Electric, supra:*

> In order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration. The objective standard of Section 16(b) imposes strict liability upon all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect.

404 U.S. at 422, 92 S.Ct. at 599, quoting *Bershad v. McDonough,* 428 F.2d 693, 696 (7th Cir.1970) *cert. denied,* 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971).

It is not this court's function to look behind the facts in an attempt to speculate upon the purely subjective motivations of the parties; rather, this court is required only to objectively review the facts to determine compliance with the statute.

A review of the record discloses compliance with the statute. It is apparent that the pricing of the transaction was structured in a manner to accommodate a Section 16(b) liability. The Section 16(b) liability was, in fact, discharged by an appropriate cash payment to Ferro at the close of the transaction. However, to be culpable under Section 16(b), there must have been an attempt to *avoid* payment of the short swing profits imposed thereby.[5] Moreover, the Supreme Court has determined that a Section 16(b) violation does not necessarily attach where the parties

---

**4.** This court is cognizant of another line of cases initiated pursuant to Section 16(b), wherein courts utilized a subjective approach in analyzing certain unorthodox or borderline transactions. *See, e.g., Kern County Land Co. v. Occidental Petroleum,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973). These cases, however, are commonly characterized by involuntary dispositions of stock and the issue presented is whether the particular transactions constituted "sales" or "purchases" within the meaning of the statute. In contrast, the instant case presents a garden variety, traditional stock-for-cash transaction. In the absence of an unorthodox, borderline

transaction, the statute is applied strictly in accordance with its terms. *See Texas International Airlines v. National Airlines, Inc.,* 714 F.2d 533 (5th Cir.1983) *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 721 (1984).

**5.** Plaintiffs cited precedent is not convincing since the cases relied upon address factual situations wherein the profiting parties attempted to avoid the repayment of short swing profits imposed by Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b).

have intentionally structured their transaction to accommodate the liability imposed by the statute:

Liability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under § 16(b). The question is, rather, whether the method used to "avoid" liability is one permitted by the statute.

*Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. at 422, 92 S.Ct. at 599.

Accordingly, this court finds no violation of Section 16(b) of the Act.

■ Plaintiffs next charge Ferro with violating of Section 29(a) of the Securities and Exchange Act, 15 U.S.C. § 78cc(a), which reads in pertinent part as follows:

Any condition, stipulation, or provision binding any person to waive compliance with any provision of this Chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void.

They urge that Ferro's board of directors illegally waived Crane's short swing profits liability. The gravamen of plaintiffs' contention is that since Ferro and Crane reached an "agreement in principle" to sell the stock at $30.30 per share, the subsequent agreement to sell the stock at $31.03 per share was tantamount to a waiver of Section 16(b) liability. Implicit in the plaintiff's argument is the erroneous hypothecation that the initial discussions between Ferro and Crane resulted in a valid contract between the parties fixing the repurchase price of the stock at $30.30 per share.

In *Champion Home Builders Co. v. Jeffress,* 490 F.2d 611, 616 (6th Cir.1974) *cert. denied sub nom. Jeffress v. Kramer,* 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974), this court noted that "[e]ven a firm commitment to buy, standing alone may not give rise to a purchase under § 16(b)." The court proceeded to conclude that liability for short swing profits under Section 16(b) would not arise unless and until the purchaser "incurred an irrevocable liability to take and pay for the ... stock." *Id.* at 618. *See also, Portnoy v. Revlon,* 650 F.2d

895 (7th Cir.1981) (date upon which letter of intent to merge was signed was not date of sale for purposes of Section 16(b)); *Staffin v. Greenberg,* 672 F.2d 1196 (3rd Cir. 1982) (date on which merger "agreement in principle" was reached is not date of sale for 16(b) purposes. Parties not irrevocably committed to sell shares until other shareholders approved merger); *Freeman v. Decio,* 584 F.2d 186, 200 (7th Cir.1978) ("[I]t is well settled that an insider acquires stock for the purposes of 16(b) when he has 'incurred an irrevocable liability to take and pay for the stock' and his 'rights and obligations become fixed.' "); *Lewis v. Bradley,* 599 F.Supp. 327 (S.D.N.Y.1984) (Parties not irrevocably bound by oral buy-sell agreement which neither party believed was binding without written contract).

A review of this record discloses that the sale did not occur until November 8, 1982, the date upon which the Ferro board of directors convened and formally considered and approved the purchase of the Ferro stock at $31.03 per share. As the district court observed, there was no evidence that the parties considered and/or treated the $30.03 per share price discussed on November 3 as a firm and binding agreement.

■ For the reasons aforesaid plaintiffs' claim alleging breaches of fiduciary duty must also fail. The record reveals no evidence that any of the directors placed themselves in a position of conflict between their fiduciary obligations and their own private interests. Accordingly, the decision of the district court is hereby AFFIRMED.