**CHAMPION HOME BUILDERS CO., a Michigan Corporation, Plaintiff,**

**Joseph L. Kramer et al., Intervenor-Plaintiffs-Appellants,**

**v.**

**Etson B. JEFFRESS, Defendant-Appellee.**

**No. 73–1341.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 17, 1973.

Decided Jan. 11, 1974.

---

Robert B. Block, New York City, for intervenor-plaintiffs-appellants; Pomerantz, Levy, Haudek & Block, New York City, Louisell, Chilingirian & Kovaleski, Detroit, Mich., on brief.

James C. Sargent, New York City, for defendant-appellee; Whitman & Ransom, New York City, Scholl, Jenkins, Robinson & Stieg, Detroit, Mich., on brief.

Before PHILLIPS, Chief Judge, and EDWARDS and McCREE, Circuit Judges.

PHILLIPS, Chief Judge.

This action was brought on behalf of a corporation to recover short-swing profits from the sale of stock by an insider. The issue on appeal is whether the purchase of the stock, within the meaning of § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), occurred within a period of less than six months prior to its sale.

In an opinion published at 352 F. Supp. 1081 (E.D.Mich.1973), the District Court held that more than six months had elapsed between the purchase and sale and dismissed the action. We reverse.

Joseph and Beatrice F. Kramer were intervenor-plaintiffs in the District Court. They are stockholders of the Champion Home Builders Co. (Champion). On behalf of the corporation they seek to recover certain profits realized by the defendant-appellee Jeffress from a sale of Champion stock allegedly within six months after its purchase.

The District Court denied the Kramers' motion for summary judgment on the issue of liability and granted Jeffress' motion for summary judgment of dismissal. The Kramers appeal. Champion has not appealed.

The case arose from the acquisition of Concord Mobile Homes, Inc. (Concord) by Champion. This acquisition was effected by a purchase of 100 per cent of the Concord stock, owned by Jeffress, in exchange for 105,000 shares of Champion stock (13 per cent of the total). After the exchange Jeffress became an officer and director of Champion. Pursuant to a public offering, and along with three other major officer-director-shareholders, Jeffress sold a portion of his Champion stock. The Kramers as shareholders of Champion seek to recover on behalf of Champion the profits from this sale as provided for under § 16(b) of the Securities Exchange Act of 1934. Section 16(b) provides as follows:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

The sole question before this court is to determine when Jeffress purchased the Champion stock.[1] The date of the sale is not in dispute.

On February 17, 1968, Jeffress entered into a handshake agreement with the President and the Treasurer of Champion. This agreement was subject to the approval of Champion's Board of Directors. On February 21, 1968, the Champion Board approved the acquisition of Concord and authorized negotiations to that end. The minutes of that meeting were signed by Champion's President.

The parties entered into a 25 page written agreement and plan of reorganization on April 17, 1968. This agreement was approved by the Champion Board on April 24, 1968. Pursuant to a public offering, and after the stock had split two-for-one, Jeffress and three other officer-director-shareholders sold part of their stock on September 12, 1968.

If the Champion stock was "purchased" on February 21, 1968, the date of the resolution, as Jeffress contends and as held by the District Court, liability under the section will not attach. On the other hand, if the stock was "purchased" on April 17, 1968, the date the agreement and plan of reorganization was executed, liability will attach for any insider swing profits realized by Jeffress.

The District Court held that the purchase date of the Champion stock was February 21, 1968. The court reasoned that the resolution of the Board of Di-

1. The lower court did not reach Jeffress' counterclaim under § 10(b) of the Act and Rule 10b–5, nor do we.

rectors was an acceptance of Jeffress' offer to sell and created a mutually binding contract. This "contract" was held to be a purchase within the meaning of § 16(b). We disagree.

Section 3(a)(13) of the Act, 15 U.S.C. § 78c(a), defines "purchase" so as to include "any contract to buy, purchase or otherwise acquire." As said by then Circuit Judge Potter Stewart, "Every transaction which can reasonably be defined as a purchase will be so defined, if the transaction is of a kind which can possibly lend itself to the speculation encompassed by § 16(b)." Ferraiolo v. Newman, 259 F.2d 342, 345 (6th Cir. 1958), cert. denied, 359 U.S. 927, 79 S. Ct. 606, 3 L.Ed.2d 629 (1959).

The Supreme Court, speaking through Mr. Justice Stewart, has stated that "where alternative constructions of the terms of § 16(b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders." Reliance Electric Co. v. Emerson Electric Co., 404 U. S. 418, 424, 92 S.Ct. 596, 600, 30 L.Ed.2d 575 (1972). This holding was reaffirmed in Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 595, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).

■■■ The definition of these terms is a matter of federal law. See, e. g., Tcherepnin v. Knight, 389 U.S. 332, 337–338, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); Blau v. Lehman, 368 U.S. 403, 413–414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962); Bershad v. McDonough, 428 F. 2d 693, 696 (7th Cir. 1970), cert. denied, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971). "The phrase 'any purchase and sale' in § 16(b) is therefore not to be limited or defined solely in terms of commercial law of sales and notions of contractual rights and duties." 428 F. 2d at 697. The transaction must be examined primarily in terms of federal securities law, and the analysis must focus on and be consistent with the congressional mandate of curbing insider

short-swing speculation. "The question thus becomes one of balancing the respective advantages and disadvantages of each contended for 'purchase' date and determining which one, if held to be the date of purchase, would be more likely to lend itself to the abuses the statute was designed to protect against." Booth v. Varian Associates, 334 F.2d 1, 4 (1st Cir. 1964), cert. denied, 379 U.S. 961, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965).

With these considerations in mind, we now turn our attention to the transaction of February 21, 1968. The holding of the District Court was as follows:

"The court finds that on February 21 the parties had reached a meeting of the minds on the essentials of their exchange agreement and that if matters had thereafter bogged down in the drafting of a formal contract, either party could have sued to enforce the contract or for its breach. Since this was merely a purchase of stock by Champion, all that was needed to bind the corporation to the deal was the approval of the Board of Directors. This approval was formally given at the February 21 meeting. Jeffress, as the seller of his own stock, was similarly bound by the acceptance of his offer of sale. Under the cases the parties were thus bound and defendant Jeffress then became the 'beneficial owner' and an insider." 352 F.Supp. 1081, 1083, (E.D.Mich. 1973).

The resolution of the Board of Directors is as follows:

"RESOLVED, that the proposed acquisition by Champion Home Builders Co. of all the issued and outstanding shares of the common stock, no par value ('Concord Stock'), of Concord Mobile Homes, Inc. and [sic] Indiana corporation, from Etson B. Jeffress in exchange for 105,000 shares of the Common Stock, par value $1, of Champion Home Builders Co., is approved, and the President and/or the Treasurer of this corporation are hereby au-

thorized and empowered to negotiate with Etson B. Jeffress and to enter into, on behalf of this corporation, an agreement and plan of reorganization providing for the acquisition of Jeffress' Concord Stock in exchange for 105,000 shares of this corporation's Common Stock, par value $1, and providing for such additional terms and conditions (not to effect the foregoing) as they consider proper and in the best interests of the corporation;

"FURTHER RESOLVED, that the President and/or the Treasurer of this corporation are authorized and empowered to execute such agreement and plan of reorganization, to make any necessary modifications thereto, to sign any and all papers, documents and instruments necessary in connection with such agreement, and to do and perform any and all acts in connection therewith; . . . ."

Jeffress has cited no authority, nor could we find any, to show that a Board of Directors' resolution is a "purchase" within the meaning of § 16(b). To the contrary, the case law forces us to reach the opposite conclusion.

In Blau v. Ogsbury, 210 F.2d 426 (2d Cir. 1954), the court held that the holder of an option to buy stock becomes the beneficial owner when he incurs "an irrevocable liability to take and pay for the stock." *Id.* at 427. The court noted that the time when the insider's rights and obligations became fixed was controlling in the application of the statute. *Id.* In Stella v. Graham-Paige Motors Corp., 232 F.2d 299 (2d Cir. 1956), cert. denied, 352 U.S. 831, 77 S.Ct. 46, 1 L. Ed.2d 52 (1956), the court was faced with a purchase contract which provided that the buyer could terminate the agreement if he could not obtain financing from a particular bank. The court, relying on *Ogsbury, supra,* held that the agreement was not a purchase because the buyer had not incurred an irrevocable liability to take and pay for the stock. 232 F.2d at 301.

■ These cases alone, however, would not be controlling. Even a firm commitment to buy, standing alone may not give rise to a purchase under § 16(b). In Booth v. Varian Associates, *supra,* there was an agreement that firmly committed the parties to an exchange of shares. The nature of the agreement left the price unfixed by providing that it would be determined at the closing market quotation on the day prior to closing, nearly three and a half years later. Moreover, the closing date could be accelerated by the issuing corporation and the buyers were insiders in this corporation. The court held that the purchase date was the date of actual exchange and not the date of agreement.

■ Finally, rights of ownership are pertinent factors in determining § 16(b) liability. In Newmark v. RKO General, Inc., 425 F.2d 348, 356 (2d Cir. 1970), cert. denied, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970), the court stated:

"On May 3 or 4, 1967, RKO entered into an agreement which granted it a conditional right to purchase more than 50% of Central's common stock at a fixed price, ensured that Central would be managed in accordance with its interests, and required a majority of Central shares to be voted in support of a merger it favored. This contract, we conclude, granted rights of ownership, particularly those rights most important to the speculative purchaser, so substantial as to make RKO a ten percent beneficial owner of Central at that time."

Similarly, the relinquishment of incidents of ownership is relevant to determining § 16(b) liability. In Bershad v. McDonough, 428 F.2d 693, 698 (7th Cir. 1970), cert. denied 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971), the court stated:

"The circumstances of the transactions clearly indicate that the stock was effectively transferred, for all practical purposes, long before the ex-

ercise of the option. The $350,000 'binder' ostensibly paid for the option represented over 14% of the total purchase price of the stock. Granting the magnitude of the sale contemplated, the size of the initial commitment strongly suggests that it 'was not just a binder.' Cf. Blau v. Allen, 163 F. Supp. 702, 705 (S.D.N.Y.1958). The extent of that payment represented, if not the exercise of the option, a significant deterrent to the abandonment of the contemplated sale. In addition, the reverse side of the 'Option Agreement' contained provisions for the transfer of the Cudahy stock, endorsed in blank, to an escrow agent pending completion of the transaction. At the same time, the McDonoughs delivered an irrevocable proxy to Smelting to vote the 272,000 shares at any regular or special shareholders' meetings. Within a few days, McDonough and one of his associate directors resigned and were replaced by representatives of Smelting's interests, including the Chairman of the Board of Directors of Smelting, and the president and director of that corporation."

In light of the above considerations, we think that the resolution of the Board of Directors was, by its literal wording and in its legal effect, nothing more than an authorization to negotiate. The resolution set the purchase price and authorized and empowered the President and Treasurer of Champion to provide for such additional terms, conditions and modifications as were proper and in the best interests of the company. The entire transaction had been contingent on Concord's earnings at the end of the fiscal year, February 29, 1968. Negotiations continued after February 21 and culminated on April 17, 1968, with a 25 page agreement and plan of reorganization.

Jeffress incurred no irrevocable liability to take and pay for the Champion stock because he had not signed the Board minutes. Moreover, because there had been no consideration or contractual intent, the resolution cannot be viewed as giving him an option to buy Champion stock. Although resolutions such as the one before us are a prerequisite to corporate transactions of the type here involved, they are only a prelude to negotiations and may be rendered ineffective when the negotiations deadlock.

■ Additionally, we find no incidents of ownership arising from the resolution of the Board of Directors such as those that were present in *Newmark* or *Bershad, supra.* The resolution was no more than a license to bargain. We conclude that the resolution was not a contract in the traditional rights and obligations sense of the word. Nor can we conclude that such a tenuous posture is a "purchase" under § 16(b).

Our inquiry, however, does not end here. The transaction also must be examined to determine if there was the potential for speculative abuse.

At the time of the resolution Jeffress was not a statutory insider of Champion. He previously had owned no stock, nor was he an officer or director. The record does not show that Jeffress had advance knowledge of the merger. The Board had made a press release notifying the public of the proposed merger. The transaction is, therefore, unlike that of *Newmark, supra,* where RKO had not only a conditional right to purchase, but also advance knowledge of the impending merger.

■ Jeffress has argued that incorporation of the purchase price set in the February 21 resolution into the April 17 contract when the market price of Champion was rising, shows that the parties intended the agreement to be firm. The intent of the parties is irrelevant to determining § 16(b) liability. *Kern, supra.* Even assuming that intent was relevant, adherence to the earlier purchase price is not conclusive. It only shows that Jeffress would not settle for

or Champion did not propose a lower price. It does not establish that the parties were bound to that price.

■ Jeffress also argues that other corporate documents refer to February 21 as being the significant date. This argument is not convincing. Jeffress referred to April 17 as the date he acquired beneficial ownership when he filed his Form 3 report to the SEC. Moreover, the parties cannot contract away their § 16(b) liability by agreements as to the purchase date. 15 U.S.C. § 78cc(a) provides:

> "Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void."

The record in this case compels us to conclude that Jeffress "purchased" the Champion stock on April 17, 1968, thereby becoming a beneficial owner and 13 per cent shareholder of Champion. It was at that time that Jeffress incurred an irrevocable liability to take and pay for the Champion stock. This transaction gave rise not only to the potential for speculative abuse but also to actual abuse.

The record shows that when Jeffress was discussing the purchase of Concord in the preliminary negotiations, he valued it at about $4,000,000. After he was advised that Champion was not willing to give him cash for Concord, he agreed to sell it for Champion stock that was worth about $2,000,000 at the time. He knew that "the two companies was [sic] going to make the stock go up, or at least this is what [he] thought would happen." Jeffress intended to profit from this expected rise in Champion stock. He wanted to realize cash from the exchange as soon as possible. From this there arose an understanding between Jeffress and Champion that he along with three major officer-director-shareholders would participate in a stock offering later that year. The timing of that offer was to be mutually satisfactory to all and was to coincide with peak market value.

Shortly after Jeffress became a beneficial owner and 13 per cent shareholder of Champion, the Board of Directors approved a two-for-one stock split. Jeffress had advance knowledge of this. On June 19, 1968, as a result of an understanding, Jeffress was elected Secretary and Director of Champion. Thus, Jeffress was not only an insider because of his stock holdings, but also because of his position in the Company. We reemphasize that this occurred after April 17 and was not a result of the resolution of February 21.

Having been its owner, Jeffress had inside knowledge of the Concord operation. His position as an insider in Champion and his active role in its management gave him an intimate knowledge of internal corporate matters. He had access to all financial records of the company. The evidence shows that the earnings rose from 10¢ per share for the quarter ending May 31, 1967, to 36¢ per share for the corresponding period in 1968.

Jeffress knew the effect that a stock split coupled with increased earnings would have in providing a rising market for his shares. He took advantage of this information and participated in the timing of the sale to maximize profits in a rising market situation. His participation was not limited solely to giving his approval as a director or signing the registration statement. It is logical to conclude that Jeffress was personally interested in obtaining the maximum amount of cash as soon as possible. This is precisely the kind of speculative abuse which the statute is designed to prevent.

The fact that the sale was made pursuant to a registration statement is of no moment. If registration were enough to dissolve liability the legislative intent would be thwarted. A registration statement would not provide the

intimate information that an insider such as Jeffress relied on.

Jeffress could have waited out the six month period. Instead he chose to maximize his profits as early as possible. In Bershad v. McDonough, *supra,* the Seventh Circuit Court of Appeals noted:

> "The thrust of the statutory scheme thus placed responsibility for meticulous observance of the provision upon the shoulders of the insider. He was deemed capable of structuring his dealings to avoid any possibility of taint and therefore must bear the risks of any inadvertent miscalculation." 428 F.2d at 696.

Jeffress has defended on the basis of his good faith and the doctrine of unjust enrichment. He contends that he was required to sell his stock and that it would be unjust enrichment for Champion to regain, at his expense, part of the consideration for Concord. The record does not show that Jeffress was forced to sell his Champion stock. To the contrary, the record indicates that Jeffress wanted to sell to realize cash and actively participated in the timing of the sale so as to maximize his profits.

 This defense is also based on a misinterpretation of § 16(b). Section 16(b) is designed to discourage short-swing transactions by insiders by taking away the profit and placing it in the hands of the corporation. By the very words of the statute, liability attaches regardless of the intention of the insider. The purpose of the statute is to protect the minority shareholders and the investing public. Magida v. Continental Can Co., Inc., 231 F.2d 843, 846 (2d Cir.), cert. denied, 351 U.S. 972, 76 S.Ct. 1031, 100 L.Ed. 1490 (1956). Thus the absence of corporate damage is not a factor in assessing § 16(b) liability. Oftentimes the corporation will suf-

fer no measurable damage or may even be an unwilling beneficiary of these profits. On the other hand, there are times when short-swing speculation by an insider may cause substantial corporate damage. "When officers and directors abuse their position to gain personal profits, the effect may be to cast a cloud on the corporation's name, injure stockholder relations and undermine public regard for the corporation's securities." Diamond v. Oreamuno, 24 N.Y. 2d 494, 499, 301 N.Y.S.2d 78, 81–82, 248 N.E.2d 910 (1969).

 While good faith and unjust enrichment are factors that can be relevant to classifying a transaction as a purchase or sale within the scope of § 16(b), it is clear that, once the transaction has been so classified, the section will impose strict liability. In Bershad v. McDonough, *supra,* the Seventh Circuit Court of Appeals stated:

> "In order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration. The objective standard of Section 16(b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation." 428 F. 2d at 696.

We hold that Jeffress is liable for short-swing profits, if any, realized by him from the sale of the stock in question. The amount of liability is a matter for determination by the District Court on remand. The issues raised by Jeffress' counterclaim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 also are matters to be resolved on remand.

Reversed and remanded for further proceedings not inconsistent with this opinion.