Leo P. PORTNOY, Plaintiff-Appellant,

v.

REVLON, INC., a Delaware Corporation, and Cooper Laboratories, Inc., a Delaware Corporation, Defendants-Appellees.

No. 80–2374.

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1981.

Decided June 3, 1981.

Jerrold M. Shapiro, Chicago, Ill., for plaintiff-appellant.

Joan M. Hall, Jenner & Block, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Circuit Judge, PECK, Senior Circuit Judge,* and SPRECHER, Circuit Judge.

* Senior Circuit Judge John W. Peck of the United States Court of Appeals for the Sixth Circuit is sitting by designation.

SPRECHER, Circuit Judge.

This case presents the question of whether there was a "sale" of stock within the meaning of Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b),[1] upon the execution of a formal merger agreement that contained several material conditions precedent to closing. Plaintiff, Leo P. Portnoy, brought this action under § 16(b) on behalf of Revlon, Inc. ("Revlon"),[2] the surviving corporation in the merger of Revlon and Barnes-Hind Pharmaceuticals, Inc. ("Barnes-Hind"), against Cooper Laboratories, Inc. ("Cooper") to recover alleged shortswing profits realized by Cooper upon the purchase and exchange of Barnes-Hind stock during 1976. The district court granted summary judgment for Cooper and dismissed Portnoy's complaint. Portnoy appealed. We affirm.

I

Cooper is a manufacturer of pharmaceuticals and related products. Barnes-Hind was a competitor of Cooper's in the pharmaceutical industry and produced products complementary to Cooper's.[3] Beginning in 1972, Cooper invested in the common stock of Barnes-Hind. Beginning in 1973, the managements of Cooper and Barnes-Hind met to explore the possibility of a business combination. As early as 1974, Barnes-Hind concluded that a combination with Cooper would not be in the best interests of Barnes-Hind or its shareholders. Cooper, however, continued to purchase Barnes-Hind common stock and by February 27, 1976, had acquired more than 10% of Barnes-Hind's shares.

On March 15, 1976, the Board of Directors of Barnes-Hind directed its Chairman and President "to undertake those actions which will enable the company to resist acquisition attempts, proxy contests or tender offers which may be made by Cooper . . . ." Board Minutes, March 15, 1976. Barnes-Hind engaged Skinner & Co. to manage "proxy contests and/or defensive measures to counter incipient adverse takeover attempts," and also retained Merrill Lynch, Pierce, Fenner & Smith to locate an alternative merger candidate. Board Minutes, March 15, 1976. Shortly thereafter, Barnes-Hind arranged a defensive combination with Syntex Corporation ("Syntex") and, in April, 1976, entered into an agreement that Syntex would acquire the outstanding shares of Barnes-Hind in exchange for Syntex stock. Cooper publicly opposed the Syntex merger and continued to purchase Barnes-Hind stock. During May, 1976, Cooper purchased 88,000 shares of Barnes-Hind common stock for $4,253,282.

1. Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) states:

> For the purpose of preventing the unfair use of information which may have been obtained by such [more than 10%] beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

2. Revlon was named in Portnoy's complaint as a putative defendant in what Portnoy describes as a "quasi-derivative suit." Revlon, however, maintained a posture of complete neutrality throughout the proceedings in the district court and before this Court.

3. The facts are uncontested. Both parties moved for summary judgment below, and neither party appears to argue that any material issues of fact remain outstanding.

On May 26, 1976, Barnes-Hind sued Cooper in federal court to enjoin Cooper from making any further purchases of Barnes-Hind stock, alleging, *inter alia*, that Cooper was engaged in a creeping tender offer. After Barnes-Hind's application for a temporary restraining order was denied, Barnes-Hind abandoned its effort to merge with Syntex. Shortly thereafter, Barnes-Hind commenced merger discussions with Revlon.

On June 11, 1976, Barnes-Hind and Revlon executed a letter of intent to merge ("Letter of Intent"). The Letter of Intent set forth the outlines of the proposed merger and the prerequisites to the execution of a formal merger agreement. The Letter of Intent stated that it "is only a statement of intent and does not constitute the contractual commitment of the parties . . . ." Cooper agreed to support the Revlon merger.

On July 29, 1976, Barnes-Hind and Revlon executed a Plan of Reorganization and Agreement of Merger ("Merger Agreement") under which each party's obligation to consummate the merger was subject to several conditions precedent. After the conditions were satisfied, the merger was closed and shares exchanged on December 31, 1976. At the closing, Cooper and Barnes-Hind executed a Mutual General Release of all potential claims against each other arising up to the date of the release, December 31, 1976. Cooper's exchange of its Barnes-Hind stock for Revlon stock resulted in a profit of $1,555,000 with respect to the 88,000 shares purchased during May.

On August 28, 1978, Portnoy purchased a single share of Revlon stock. After requesting Revlon to sue Cooper for recovery of the alleged short-swing profits and receiving Revlon's refusal to do so, Portnoy filed this suit on December 15, 1978 on behalf of Revlon and Revlon shareholders as successors-in-interest to Barnes-Hind. Summary judgment was entered dismissing Portnoy's complaint on August 27, 1980.

II

The district court's Memorandum Order asserts two grounds for dismissing the suit. The court held first that neither the June 11 Letter of Intent nor the July 29 Merger Agreement constituted a "sale" of stock for purposes of § 16(b). Rather, Cooper's "sale" of stock occurred at the closing on December 31, 1976. Since Cooper's last purchase of Barnes-Hind stock occurred in May, there was no purchase and sale within the required six month period under § 16(b). As an alternative ground for dismissal, the court held that Cooper's exchange of stock pursuant to the defensive Revlon merger was an "unorthodox transaction" with no possibility of speculative insider abuse and, thus, was exempted from § 16(b) coverage by the Supreme Court's holding in *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973). We affirm the district court's grant of summary judgment on the first ground. Consequently, we need not, and do not, reach the court's second ground or the alternative grounds urged by Cooper.[4]

Section 16(b) of the Securities Exchange Act of 1934 prohibits a purchase and sale or sale and purchase of an issuer's stock by officers, directors, or beneficial owners of more than 10% of any class of securities of the issuer within any period of less than six months. The issuer, or one suing on behalf of the issuer, may recover from the insider any profit derived from the short-swing transaction. It is uncontested that prior to Cooper's May purchases of Barnes-Hind stock, Cooper already held more than 10% of Barnes-Hind's stock. The critical ques-

---

**4.** Cooper argues that, in addition to the district court's analysis, three other grounds exist for dismissing Portnoy's claim. First, Cooper asserts that the Mutual General Release executed by Barnes-Hind and Cooper at the closing of the Revlon merger precludes this suit against Cooper by an alleged successor-in-interest to Barnes-Hind. Second, Cooper argues that

Portnoy, as only a subsequent purchaser of Revlon stock, lacks standing to sue on behalf of Barnes-Hind. Finally, Cooper argues that if the June or July agreements are deemed to be sales by Cooper, Portnoy failed to file suit within the two year statute of limitations set forth in § 16(b).

tion in this case is whether there was a sale of securities within six months of the May purchases. The closing at which Cooper physically exchanged its Barnes-Hind stock for Revlon stock occurred on December 31, 1976, well beyond six months after the most recent purchase, and, consequently, beyond the scope of § 16(b)'s reach. Thus, for Portnoy to establish a short-swing profit by Cooper in violation of § 16(b), he must prove that either the June 11 Letter of Intent or the July 29 Merger Agreement constituted a "sale" of Cooper's Barnes-Hind stock.

Portnoy argues that either agreement can be interpreted as irrevocably binding Cooper to exchange its Barnes-Hind stock for Revlon stock. According to Portnoy, since Cooper pledged its stock in support of the Revlon merger, and since the conditions precedent to closing the transaction were beyond the control of Cooper and required no more actions by Cooper, this Court should hold that, for purposes of § 16(b), Cooper "sold" its Barnes-Hind stock no later than July 29, 1976, thus well within six months of the May purchases. Portnoy's argument, however, is not supported either by the facts of this case or by the applicable case law under § 16(b).

## A

Our inquiry is limited to whether execution of the June 11 Letter of Intent or the July 29 Merger Agreement constituted a "sale" of Cooper's shares of Barnes-Hind within the meaning of § 16(b). The only statutory guidance as to what constitutes a "sale" of securities for purposes of § 16(b) is the general definition provided by § 3(a)(14) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(14), which states that "[t]he terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of." Although this definition indicates that something less than final execution and delivery of securities may constitute a sale, we still are left with the question of whether the Letter of Intent or the Merger Agreement constituted a contract by Cooper to sell its Barnes-Hind shares that falls within the

scope of § 16(b). Consequently, we must go beyond the text of the statute to determine when Cooper "contracted to sell" its Barnes-Hind shares for purposes of § 16(b).

■ Construction of the terms "sale" and "contract to sell" is a matter of federal law. *Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir. 1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971). We must construe these terms in a manner consistent with the remedial purpose of § 16(b) to curb or inhibit speculative abuses by insiders. *See Oliff v. Exchange International Corp.*, No. 78–1830 (7th Cir. Sept. 18, 1980). "The phrase 'any purchase and sale' in Section 16(b) is therefore not to be limited or defined solely in terms of commercial law of sales and notions of contractual rights and duties." *Bershad v. McDonough*, 428 F.2d at 697. We must examine "the factual circumstances of the transaction, the sequence of relevant transactions, and whether the insider is 'purchasing' or 'selling' the security." *Id.* We then must integrate the technical aspects of the transaction with the remedial purposes of § 16(b), and determine when the insider became so irrevocably bound to dispose of his securities so that his rights and obligations became fixed and the opportunity for speculative abuse was removed. *Freeman v. Decio*, 584 F.2d 186, 200 (7th Cir. 1978) ("it is well settled that an insider acquires stock for purposes of 16(b) when he has 'incurred an irrevocable liability to take and pay for the stock' and his 'rights and obligations become fixed.' *Blau v. Ogsbury*, 210 F.2d 426, 427 (2d Cir. 1954); *Silverman v. Landa*, 306 F.2d 422, 424 (2d Cir. 1962)"). *See Provident Securities Co. v. Foremost-McKesson, Inc.*, 506 F.2d 601, 606–07 (9th Cir. 1974), *aff'd*, 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976); *Champion Home Builders Co. v. Jeffress*, 490 F.2d 611, 615–18 (6th Cir.), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974); *Stella v. Graham-Paige Motors Corp.*, 232 F.2d 299, 301 (2d Cir.), *cert. denied*, 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956).

## B

■ We turn first to the June 11 Letter of Intent. This letter sets forth the general terms of the proposed Barnes-Hind/Revlon merger, including the exchange ratio, the proposed closing date, some major conditions precedent to closing, and the prerequisites for executing formal merger documents. The Letter of Intent states that it "is only a statement of intent and does not constitute the contractual commitment of the parties hereto." Cooper signed an addendum to the Letter of Intent stating that it consented to Barnes-Hind entering into the Letter of Intent. Cooper also executed a separate "Agreement as to Voting" stating that Cooper would present its Barnes-Hind shares at any shareholders meeting and would vote its shares in favor of the proposed Revlon acquisition "subject to the preparation of the definitive acquisition agreement in accordance with the Letter of Intent, without any substantial deviation from the terms of the Letter of Intent, unless approved by the undersigned such approval not to be unreasonably withheld."

We see no way that the execution of these preliminary documents can be deemed a "sale" by Cooper of its Barnes-Hind shares. A formal exchange of shares pursuant to the merger was contingent upon a number of events, any of which could have spelled disaster for the proposed merger. Cooper consented only to Barnes-Hind entering into the non-binding Letter of Intent and stated that it would support the proposed merger if definitive merger documents consistent with the Letter of Intent were executed. There was no assurance that Revlon and Barnes-Hind would agree on all of the complicated matters essential to completing the proposed merger or that the requisite shareholder approval would be forthcoming. Indeed, the Letter of Intent was not a binding merger agreement, but was only a non-contractual understanding of the parties under which they committed themselves to proceed in good faith with the complicated negotiation of a formal merger agreement and with such other actions necessary to consummation of the merger. In short, the June 11 documents fall far short of establishing a binding commitment by Cooper to dispose of its Barnes-Hind shares.

Nor can we conclude that following execution of these preliminary documents the possibility of speculative abuse of insider information by Cooper was precluded. Although Cooper executed a letter to Revlon stating that Cooper would not acquire any additional shares of Barnes-Hind or negotiate with third parties for the sale of the business, assets, or all of the shares of Barnes-Hind, Cooper retained the right to unilaterally dispose of its Barnes-Hind holdings to unrelated third parties. The continuing possibility that Cooper would dispose of its shares prior to the close of the Revlon merger demonstrates that the potential for speculative trading by a supposed insider continued after June 11.[5] A cursory review of the daily financial papers reveals that with acquisitions of this nature there is always a distinct possibility that the complex financial, legal, and shareholder details necessary for consummation of the merger may not be resolved or that a more attractive merger partner may suddenly appear. Consequently, because Cooper retained its power to dispose of its Barnes-Hind shares in an alternative, potentially speculative manner, there was no "sale" for purposes of § 16(b) by Cooper of its Barnes-Hind shares as a result of the documents executed on June 11, 1976. See Champion Home Builders Co. v. Jeffress, 490 F.2d 611, 614–17 (6th Cir.), cert. denied, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974) (preliminary handshake agreement for acquisition, and subsequent Board of Directors' authorization to negotiate, did not constitute an ir-

5. We have assumed, for purposes of deciding whether there was a purchase and sale within six months, that Cooper was an insider under § 16(b). Our discussion here and elsewhere, however, does not reflect any opinion by this Court as to whether Cooper's position in Barnes-Hind gave rise to a potential for speculative abuse that would have made the exception for "unorthodox transactions" set forth in Kern County inapplicable. We do not reach that issue, see discussion accompanying note 4, supra.

revocable commitment to sell for purposes of § 16(b)).

### C

■ Portnoy's alternative candidate for a "sale" by Cooper within six months of the May purchases is the July 29 Merger Agreement executed by Barnes-Hind and Revlon. But, the terms of the Merger Agreement reveal that it too did not irrevocably bind Cooper to dispose of its shares such that no further potential for speculative abuse of an insider position remained.

The significant conditions precedent to closing contained in the Merger Agreement compel us to hold that no "sale" occurred on July 29.[6] As the Merger Agreement states, and as the district court found, consummation of the merger was subject to, *inter alia*, the following significant conditions:[7]

1. The receipt from IRS of a ruling, satisfactory to Revlon's counsel, that the merger would qualify as a tax free reorganization under § 368(a) of the IRC;

2. The receipt from Peat Marwick Mitchell & Co. of an opinion that the contemplated merger would be treated as a 'pooling of interests' for accounting purposes;

3. The exercise by the holders of fewer than 27,380 shares of Barnes-Hind stock of the right of dissenting shareholders to require Barnes-Hind to purchase their shares for fair market value;

4. The consumation [sic] of employment agreements between Revlon and certain named employees of Barnes-Hind;

5. The consumation [sic] of non-competition undertakings by certain shareholders of Barnes-Hind.

*Portnoy v. Revlon*, No. 78 C 4980, Memorandum Opinion at 4–5.

The nonfulfillment of any one of these significant conditions could have blocked consummation of the merger. Indeed, the favorable tax ruling was not received until December 7, 1976, and dissenting shareholder appraisal rights could have been exercised up until December 30, 1976.[8]

Consequently, examining Cooper's position as of July 29, we are convinced that there was no "sale" by Cooper of its Barnes-Hind shares in the sense of an irrevocable commitment and a fixing of Cooper's rights and obligations. The eventual exchange of shares by Cooper was dependent upon the fulfillment of several significant conditions. Moreover, throughout the period preceding the actual exchange of shares at closing, Cooper remained subject to market fluctuations and retained its speculative position as a putative Barnes-Hind insider. The execution of the Merger Agreement simply did not constitute a "sale" for purposes of § 16(b).

6. We leave open the possibility that under certain circumstances a "sale" for purposes of § 16(b) may occur prior to closing once the significant conditions precedent have been fulfilled. *See Provident Securities Co. v. Foremost-McKesson, Inc.*, 506 F.2d 601, 607 (9th Cir. 1974), *aff'd on other grounds*, 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976) (underwriting was subject only to usual conditions precedent and only substantial condition precedent to closing was satisfied as of date the agreement was executed). In the case at bar, it is clear that several of the significant conditions precedent to closing, including the exercise of dissenting shareholder appraisal rights and the receipt of the Internal Revenue Service approval that the merger would be a tax-free reorganization, were not fulfilled until after expiration of the six month statutory period.

7. We assume that the requisite 66⅔% shareholder approval did not present a significant condition precedent to closing in this case because Cooper and other significant shareholders comprising at least 66⅔% of the outstanding Barnes-Hind stock had agreed to vote their shares in approval of the merger. We note, however, that in other circumstances shareholder approval may constitute a significant condition precedent to closing and could affect our determination of when a "sale" of securities occurs for purposes of § 16(b).

8. The applicable law regarding shareholder appraisal rights, Cal.Corp.Code § 4301, grants dissenting shareholders 30 days, after notice of shareholder approval of the merger or consolidation is mailed, in which to demand that the issuer corporation purchase their shares for the fair market value of the shares as of the day prior to shareholder approval. In the case at bar, dissenting shareholders had 30 days after the November 30, 1976 shareholder meeting during which to demand their appraisal right.

The distinction between an agreement and actual execution of a transaction for purposes of a § 16(b) purchase was discussed in *Stella v. Graham-Paige Motors Corp.*, 232 F.2d 299 (2d Cir.), *cert. denied*, 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956). There, the court addressed the question of whether, for purposes of § 16(b), the insider "purchased" securities when the purchase agreement was executed or when the transaction was actually closed. The purchase agreement was conditioned upon the purchaser securing a bank loan guaranteed by the seller, among others. Since the guarantee, and hence the loan, were not executed prior to closing, the Second Circuit held that the purchaser "had not incurred 'an irrevocable liability to take and pay for the stock'" prior to the closing. 232 F.2d at 301 (footnote omitted). Consequently, the court held that the "purchase" occurred at the time of closing, not upon execution of the contingent purchase agreement.[9]

■ Portnoy makes much of Cooper's loss of control over the transaction after the June 11 documents and the July 29 Merger Agreement were executed. Although we agree that the actual consummation of the transaction largely was beyond Cooper's immediate control and direction, we do not find this dispositive. That one party has completed whatever steps it can take does not finalize the transaction if significant obstacles to closing remain to be faced. There was no irrevocable commitment to exchange shares until the significant conditions precedent to closing were fulfilled. Nor can we ignore Cooper's continuing potential for speculative abuse of its insider position. Assuming the Revlon merger had collapsed, Cooper would have retained its Barnes-Hind stock and the continued potential for speculation based on insider information.

The reasoning of *Silverman v. Landa*, 306 F.2d 422, 424 (2d Cir. 1962) is applicable to the case at bar. In *Silverman*, the court held that a director had not purchased and sold securities within less than six months by writing both puts and calls on the stock of his corporation, since the call options were not exercised. The court held that since call options had not been exercised within six months, the director's beneficial ownership had not changed, i. e., his insider's rights and obligations had not changed merely by placing the unexercised call options on the market. The court, 306 F.2d at 424, reasoned that:

> By its nature, the option is one-sided; it fixes the obligations, but not the rights, of the issuer. Landa cannot be said to have "sold" or "purchased" Fruehauf stock; should the options lapse unexercised (and in fact the call options did so lapse), no change in his beneficial ownership of the underlying security would occur. And, most importantly, any change would occur at the pleasure of the optionee.

This analysis is equally applicable to Cooper's position at the time the Merger Agreement was executed. Although Cooper had obligated itself to support the merger and exchange its Barnes-Hind stock, Cooper did not have the right to insist that the exchange go forward without regard to the material conditions precedent to closing. Had the conditions not been fulfilled or waived by Revlon, no change in Cooper's beneficial ownership of Barnes-Hind stock would have occurred.

Finally, Portnoy contends that the Ninth Circuit's decision in *Provident Securities Co. v. Foremost-McKesson, Inc.*, 506 F.2d 601 (9th Cir. 1974), *aff'd on other grounds*, 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976), is on all fours with the case at bar and establishes that the "sale" of securities oc-

---

**9.** *See also Champion Home Builders Co. v. Jeffress*, 490 F.2d 611 (6th Cir.), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974) (where no conditions to closing in the acquisition agreement were in issue, the court held that a purchase of stock within § 16(b) took place upon execution and board approval of a written acquisition agreement, and not upon an earlier board approval of a commitment to buy); *Morales v. Reading & Bates Offshore Drilling Co.*, 392 F.Supp. 41, 44–5 (N.D.Okl. 1975) (interpret "purchase" and "sale" in terms of irrevocable liability).

curred upon execution of the Merger Agreement. In *Foremost-McKesson*, the Ninth Circuit affirmed the district court's holding that the purchase by which a shareholder obtains holdings of more than 10 percent of the issuer's shares does not fall within § 16(b). The court also stated that the date an underwriting agreement was executed, and not the date of closing, would be considered the date of "sale" for § 16(b). 506 F.2d at 606–07. Portnoy argues that we should follow the Ninth Circuit and hold that Cooper's sale of its Barnes-Hind stock occurred upon execution of the Merger Agreement.

Portnoy's argument, however, is unpersuasive. First, in affirming the Ninth Circuit's holding regarding the acquisition that makes one a 10 percent shareholder, the Supreme Court expressly refused to consider the Ninth Circuit's analysis of when the "sale" occurred. *Foremost-McKesson*, 423 U.S. at 238–39 nn.7&8, 96 S.Ct. at 513–514. Consequently, we cannot assume that the Ninth Circuit's holding was endorsed by the Supreme Court.

But even if we do accept the Ninth Circuit's analysis, that analysis does not alter the outcome of this case. As the Supreme Court indicated, "[t]he Court of Appeals agreed that conditions to performance might prevent a contract from being a 'sale' prior to closing." 423 U.S. at 239 n.7, 96 S.Ct. at 513. But, the Ninth Circuit found that upon execution of the underwriting agreement the parties were bound, the price was fixed, and the seller was not subject to "market risks after the date of the agreement." Therefore, the sale was complete, "subject only to the usual conditions precedent to closing." 506 F.2d at 607. According to the Ninth Circuit, the only significant condition precedent to closing—that a registration statement become effective—was satisfied on the very date the underwriting agreement was executed. Consequently, the court held that there was a binding sale on the date of the agreement and not on the date of closing.

Unlike the circumstances in *Foremost-McKesson*, execution of the Merger Agreement in the case at bar did not irrevocably bind the parties. Cooper remained subject to market risks until the date of closing because the sale of stock was in terms of an exchange ratio rather than a fixed price as in *Foremost-McKesson*. More importantly, consummation of the Revlon merger was contingent upon several major conditions that were not satisfied until shortly before the closing. The requirements for closing set forth in the Merger Agreement were more than just the "usual conditions precedent to closing." They constituted significant roadblocks that could have doomed the Revlon merger. We hold that there was no "sale" by Cooper of its Barnes-Hind shares until the closing held on December 31, 1976. Consequently, there was no purchase and sale by Cooper within six months, and § 16(b) was not violated.

### III

For the foregoing reasons, the judgment of the district court granting summary judgment to defendants and dismissing Portnoy's complaint is

AFFIRMED.