**Harry LEWIS, Plaintiff,**

v.

**Douglas H. BRADLEY and Iroquois Brands, Ltd., Defendants.**

**No. 83 Civ. 7324 (EW).**

United States District Court, S.D. New York.

Dec. 18, 1984.

---

Levy & Levy, New York City, for plaintiff; Morris J. Levy, New York City, of counsel.

Reid & Priest, New York City, for defendants; Peter C. Williams, Joseph C. Mitchell, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, Harry Lewis ("Lewis"), brings this action on behalf of Iroquois Brands Ltd. ("Iroquois") to recover alleged short-swing profits from an insider, defendant Douglas H. Bradley ("Bradley"), pursuant to Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. Section 78p(b). Bradley is a former officer and director of Iroquois. He moves to dismiss the complaint for failure to state a claim upon which relief may be granted, pursuant to Fed.R.Civ.P. 12(b)(6); in response, plaintiff cross-moves for summary judgment pursuant to Rule 56, Fed.R.Civ.P. Each party has submitted affidavits in support of his, and in opposition to, the other's motion. Accordingly, the respective motion of each shall be treated as one for summary judgment.[1]

## BACKGROUND

Bradley first became associated with Iroquois in 1968 when the Angostura-Wupperman Corp., of which he was then the President and a large stockholder, merged with Iroquois on a stock per stock basis. Pursuant to the merger, Bradley received almost 100,000 shares of Iroquois stock in exchange for his shares of Angostura-Wupperman. Upon the merger, Bradley was elected a director and officer of Iroquois and remained so until 1983. Thereafter,

---

1. *See* Fed.R.Civ.P. 12(b).

during his service with Iroquois, he acquired in 1973, 1974 and 1977 under Iroquois' Stock Option Plan, options to purchase 30,000 shares of Iroquois stock at the market price on the date the option was granted. However, as noted hereafter he did not exercise any of these options prior to May 23, 1983.

In 1981, defendant planned his retirement on a phased-out basis, resigning in that year as Chairman of the Board, and on May 10, 1983 as an officer and Chairman of the Executive Committee of the Board. On May 23, 1983, in accordance with plans previously announced at a Board meeting, Bradley resigned as a director, completely severing his ties with the company. The resignation was submitted at a prearranged conference held that day with Terence J. Fox ("Fox"), Chairman of the Board and Chief Executive officer of Iroquois and Joseph H. Sweeney, its Senior Vice President-Finance. After his resignation, on the same day he sold to Iroquois 74,002 shares of his common stock holdings at $14 per share, the market price on that day. Immediately thereafter, Bradley exercised his options to purchase 30,000 shares of Iroquois common stock at the market price on the respective dates the options were granted, referred to above, which was below the market price on May 23, 1983, paying for the shares with 14,192 shares of Iroquois stock. The stock options, because of Bradley's retirement and by their terms, were due to expire within 90 days. On June 9, 1983 Bradley filed a Form 4 with the Securities and Exchange Commission, reporting all of the May 23, 1983 transactions.

## DISCUSSION

Section 16(b) of the Securities Exchange Act provides, in pertinent part, that a director surrender to the issuer all profits realized "from any purchase and sale, or any sale and purchase, of any equity security of such issuer ... within any period of less than six months."[2] To recover under

Section 16(b), plaintiff must show either a "sale" or a "purchase" was made while Bradley was an Iroquois director.[3] Bradley argues that plaintiff's Section 16(b) claim is without merit because all "sales" or "purchases" occurred after his resignation as a director on May 23, 1983. Initially, plaintiff in his complaint alleged that on that date Bradley was a director of Iroquois. Apparently recognizing that there is no basis for the application of Section 16(b) solely to the May 23 transactions, the plaintiff on this motion contends that while the "sale" of the 74,002 shares and the "purchase" of the 30,000 shares by the exercise of the options were executed on May 23, 1983 subsequent to his resignation, Bradley in fact had contracted to sell the shares earlier, sometime between May 10, 1983 and prior to May 23, 1983, when he was still a director of Iroquois. Here, plaintiff relies upon Bradley's deposition testimony to the effect that he had orally agreed to sell his shares to the company *prior* to May 23, in conversations with Fox.

■ The parties' contentions leave a discrete question for this Court to decide on these cross-motions for summary judgment: When did Bradley "sell" his stock to Iroquois within the meaning of Section 16(b)? If Bradley sold it prior to May 23, 1983, liability must attach, for there is no dispute that he was a director of the corporation and that by the exercise of his options a corresponding purchase was made by Bradley within six months thereafter. If not, summary judgment must be granted in Bradley's favor, for he would have made no purchases or sales while he was a director. Because plaintiff relies solely on Bradley's deposition testimony to support his position, there is no dispute about the facts underlying this question, and thus, the case is ripe for summary judgment.

Bradley testified that on May 9, 1984, the day before he was to announce his complete retirement at a Board meeting, Fox inquired of him whether he would like to

---

**2.** 15 U.S.C. §78p(b) (1982).

**3.** *Lewis v. Varnes,* 505 F.2d 785, 789 (2d Cir. 1974).

sell his shares to Iroquois, in view of the fact that Bradley was no longer going to be employed by the company. Bradley indicated that he did want to sell; and Fox responded that it was possible for the company to purchase the stock pursuant to an outstanding stock repurchase program which authorized purchases up to a certain amount, and that the company had sufficient funds to do so. Sometime thereafter, they had a telephone conversation during which Bradley confirmed that he would sell to Iroquois and Fox said Iroquois wanted to buy the shares. They did not discuss price during these conversations. The substance of these conversations was, in Bradley's own words, that "the company had agreed to buy my stock" and "I had agreed to sell it to them." Bradley explicitly stated that "there was no price mentioned until the day that it was sold." Several days prior to May 23, Bradley called Fox from Canada and informed him that he would be in New York City on May 23, and would be able to complete the transaction then.

On that date, Bradley arrived at Iroquois' corporate apartment in New York City where he first submitted his resignation as a director, then tendered the certificates for the shares of stock sold to Iroquois and was paid by check which was drawn only after the market price per share on that date had been ascertained. Bradley's resignation was the first order of business; next, was the sale and delivery of the shares; and finally, the exercise of his option rights. That the sequence of events may have been deliberately de-signed is of no consequence. There is nothing improper or illegal in seeking to avoid the impact of Section 16(b).[4] Except for Bradley's transactions on May 23 he did not make any purchases or sales of stock in the six month period before or after May 23, 1983.[5] Upon the totality of undisputed facts this is not a case of speculation "actual or potential" by an insider, "the only vice within the purview of § 16(b)."[6]

■ The question remains, whether, as plaintiff contends, defendant sold the stock at a point prior to his resignation within the meaning of the statute. Sales covered by Section 16(b) are broadly defined to include "any contract to sell or otherwise dispose of" any security.[7] What constitutes a "contract to sell" is a question of federal law, and therefore, is "not to be limited or defined solely in terms of commercial law of sales and notions of contractual rights and duties."[8] In keeping with the statute's purposes, whether a "sale" has occurred depends on whether the insider has incurred an "irrevocable liability" to dispose of the stock so that his "rights and obligations" have become fixed.[9]

■ The Court finds that prior to May 23, 1983, Bradley did not incur either an "irrevocable liability" to sell his shares, nor were his rights and obligations fixed. In the absence of a fixed price, Bradley's rights and obligations could not be determined in any meaningful sense, in terms of the statute's purpose to thwart short-swing speculation based on inside information.[10]

4. *See Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972).

5. It should be noted that Bradley's wife sold 1500 shares in May of 1983 and 3,000 shares in June of 1983, after Bradley resigned as an Iroquois director.

6. *Blau v. Ogsbury,* 210 F.2d 426, 427 (2d Cir. 1954).

7. *See* 15 U.S.C. § 78c(a)(14) (1982).

8. *Champion Home Builders Co. v. Jeffress,* 490 F.2d 611, 615 (6th Cir.), *cert. denied sub nom. Jeffress v. Kramer,* 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974) (quoting *Bershad v.*

*McDonough,* 428 F.2d 693, 697 (7th Cir.1970), *cert. denied,* 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971)).

9. *Portnoy v. Revlon, Inc.,* 650 F.2d 895, 898 (7th Cir.1981); *Blau v. Ogsbury,* 210 F.2d 426, 427 (2d Cir.1954); *see Champion Home Builders Co. v. Jeffress,* 490 F.2d 611, 615 (6th Cir.), *cert. denied sub nom. Jeffress v. Kramer,* 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974); *Stella v. Graham-Paige Motors Corp.,* 232 F.2d 299, 301 (2d Cir.), *cert. denied,* 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956).

10. In an orthodox transaction, as here, the Court, in light of the statute's prophylactic purposes, must use an objective standard in deter-

What a speculator needs, and what Bradley did not have here, was a "firm assurance that a fixed quantity [of stock] can be acquired or disposed of at a fixed price ..."[11] As the First Circuit has stated:

> Not only did [the alleged contract] leave the purchase price unfixed, it provided that the price should be fixed at the closing market quotation on the day prior to closing .... Besides sheltering appellants from the possible advantages or disadvantages of a fluctuating market, this would appear to have made speculation against the contract not only risky but, as appellee contends, virtually impossible.[12]

That Bradley had not irrevocably incurred liability to sell his shares appears from the lack of a price term, but also from the overall tentative nature of the arrangement prior to May 23. Not only was no firm price agreed upon, no documents were exchanged, and no check was prepared until after Bradley had tendered the actual stock certificates and the market price for that day determined. In addition, Bradley's testimony indicates that neither he nor Fox were of the view that the oral agreement was binding in the absence of some written document. When Bradley arrived at the meeting on May 23, 1983, he had not delivered any of the rights associated with the stock, nor had he received any assurance as to the per share compensation he would receive. Although State law is not determinative in construing the terms of Section 16(b), it is of some signifi-

cance that it is unlikely Bradley could have enforced the contract without a writing.[13]

In light of the tentative nature of the agreement and the fact that the price was to be fixed at the market rate on the date of closing, this Court holds that the discussions between Bradley and Fox prior to May 23 did not constitute a "sale" within the meaning of Section 16(b). Accordingly, defendant's motion for summary judgment is granted, and plaintiff's cross-motion denied.

So ordered.

---

mining whether there was a "sale" within the meaning of the statute. Cf. *Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973) (unorthodox transaction). However, "where alternative constructions of the terms of § 16(b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders." *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 424, 92 S.Ct. 596, 600, 30 L.Ed.2d 575 (1972). It is perfectly consistent with an objective standard, [i]n interpreting the terms "purchase" and "sale," [to] ask[ ] whether the particular type of transaction involved is one that gives rise to speculative abuse." *Id.* at 424 n. 4, 92 S.Ct. at 600 n. 4.

**11.** *Blau v. Ogsbury,* 210 F.2d 426, 427 (2d Cir. 1954).

**12.** *Booth v. Varian Assoc.,* 334 F.2d 1, 4 (1st Cir.1964), *cert. denied,* 379 U.S. 961, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965).

**13.** N.Y.U.C.C. § 8–319 (McKinney 1964 & Supp. 1983–84); *cf. Morales v. Gould Investors Trust,* 445 F.Supp. 1144, 1151 (S.D.N.Y.1977) (fact that agreement might not be enforceable per the Statute of Frauds does not render an otherwise irrevocable transaction, revocable for purposes of § 16(b)), *aff'd without opinion* 578 F.2d 1369 (2d Cir.1978).